IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COLLEEN STUART, JANA HARDEN,
And JENNIFER CROSS,

                    Plaintiffs,

v.                                                          Case No.  23-2021-JWB

CITY OF TOPEKA, KANSAS
and BRYAN WHEELES, in his individual capacity,

                    Defendants.

## MEMORANDUM AND ORDER

This matter involves sex discrimination claims filed by three women who are employed by the City of Topeka, Kansas (the "City") as law enforcement officers.  Plaintiffs bring suit against the City and Bryan Wheeles, the Chief of Police, in his individual capacity.  Plaintiffs contend that the City failed to promote them because of their sex in violation of Title VII.  Plaintiffs also assert a claim under 42 U.S.C. § 1983 for violations of their right to equal protection against the City and Wheeles in his individual capacity.  The matter is before the court on Defendants' motion for summary judgment.  (Doc. 57.)  Plaintiffs have also moved to amend their complaint and to file a surreply.  (Docs.  65, 73.)  Further, the parties have filed motions to determine the place of trial.  (Docs. 53, 55.)  The motions are fully briefed and ripe for decision.  (Docs. 54, 56, 58, 66, 71, 74, 75.)  Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART for the reasons herein.  Plaintiffs' motion to amend is DENIED AS MOOT.  The court determines that the place of trial is Topeka, Kansas.

1

I.      **Facts**

 The facts set forth herein are material to the issues, supported by the record evidence, and uncontroverted or construed in a light most favorable to Plaintiffs.[1]   The facts section largely mirrors the format the parties undertook in addressing the material facts at issue in this case.

Plaintiff Colleen Stuart.  In June 1999, Stuart was hired by the Topeka Police Department ("TPD") as a patrol officer.  In 2003, Stuart was promoted to the position of school resource officer by then-Chief of Police Klumpp, who is a male.  She was employed in that position until October 2009 and did not have any issues or concerns with sex discrimination at that time.  In 2009, she was promoted to the position of corporal in the patrol division.  As corporal, she supervised male employees.  (Docs 58 at 2; 66 at  4.)  During her tenure as corporal, she recalls one instance of alleged discrimination; she reported it to her male supervisor, and she recalls that he took appropriate action.  (Stuart Depo., Doc. 58-2 at 25:11–30:2.)

 In June 2011, she was promoted to the position of quartermaster in the Administrative Bureau by then-Chief Miller, who is a male.  She testified that one instance of alleged discrimination, which involved a co-worker, occurred during her time as quartermaster.  (*Id.* at 31:10–35:3.)  The incident was reported and the officer involved was denied a promotion as a result of the incident.  In March 2012, Stuart was promoted to the position of sergeant.  Stuart testified that from March 2012 to November 2014,  her superior, Scott Conklin, treated her in a condescending manner.  Beyond recalling that he called her a "bitch" on one occasion, she could

---

[1] Although the court, at times, addresses contentions that are not supported by the evidence, the court has not undertaken to address all allegations or attempts to controvert facts that are not supported by a record citation.  As stated, the facts recited herein are supported by the evidence.  Further, this court does not consider any argument and inferences made in the facts section.  *See S.E.S. as next friend of J.M.S. v. Galena Unified Sch. Dist. No. 499*, 446 F. Supp. 3d 743, 760 (D. Kan. 2020) (citing *Leathers v. Leathers*, No. 08-1213-MLB, 2012 WL 5936281, at *2 (D. Kan. Nov. 27, 2012) ("Statements of uncontroverted facts and responses thereto shall cite only facts. Argument and the drawing of inferences shall be reserved for the authorities and argument section...."))

not recall any particular conversations and she did not report the conversations to human resources or Conklin's superiors. (*Id.* at 44:6–49:7.) In November 2014, then-Chief Brown offered Stuart the position of Special Projects. Chief Brown told Stuart that she was offered the position because he believed that her skills would work for the position. (*Id.* at 52:3–11.) In 2015, Stuart applied for a position as lieutenant and was promoted by Chief Brown. During this time, Conklin retired and Defendant Wheeles became Stuart's supervisor. Stuart testified that she did not have any issues with Wheeles before or after he became her supervisor. (Doc. 58 at 4; 66 at 4.) During this time, she was serving as the Public Information Officer in the Chief's office. For this role, she was required to be available 24/7 and appear at crime scenes regardless of the time. After leaving the position, in February 2018, she was replaced by Andy Beightel who was not required to be available at all times nor appear at crime scenes in the middle of the night. (Stuart Depo., Doc. 66-1 at 129:1–6.)

On February 24, 2018, Stuart applied for a position as a captain and was promoted to the position by then-Chief Bill Cochran. Stuart testified that between February 2018 and January 2022, she had concerns with the way Major Scott Gilchrist treated her. Stuart testified that he asked female commanders, including Co-Plaintiff Jana Harden, if he could "interrupt your recipe exchange for a second" when they were talking. (*Id.* at 69:7–14.) Stuart testified that Gilchrist would make comments periodically but that she never reported any comments to anyone in human resources or in the chain of command. (*Id.* at 73:2–16.) She also learned about a male officer calling some female officers the "ponytail squad." (*Id.* at 70:5–24.) These female officers did not want to do anything about the comments but they were offensive to them. (*Id.*)

Stuart testified that she had issues with several individuals, including Wheeles, who circumvented her chain of command and allowed others to do so. (Docs. 66 at 19; 72 at 5.) Stuart

3

believes that on December 28, 2021, Michael Cross also circumvented her chain of command. She confronted him about the incident, and Cross apologized. Stuart was satisfied with his response. (Docs. 58 at 5; 66 at 4.) With respect to Wheeles, Stuart recognizes that as chief he has the discretion to jump the chain of command but that it is just frustrating to her. (Stuart Depo. at 93:4–7.)

Plaintiff Jana Harden. Harden was hired in 2000 as a patrol officer. She was transferred to the Narcotics Unit in 2004 by Chief Miller. In 2006, she was not selected for the Response Team. She was told by Officer McNeal that she was not selected because leadership did not want a female on the team. (Harden Depo., Doc. 58-5 at 207:12–20.) She reported this statement to Sergeant Irwin or Pace but does not recall what happened after she reported it. (*Id.* at 209:3–23.) At some point between 2004 to 2009, Harden received information that Michael Cross had thrown evidence into plain view and lied about it.[2] Harden reported this information to her supervisor. (Docs. 58 at 6; 66 at 4.) In 2009, Harden was promoted to sergeant. In 2010, money from a fundraiser went missing. Michael Cross had access to that money and Harden reported the missing money to her supervisor. Harden has no information as to the outcome of her report nor where the money went. (*Id.*) In July 2011, Harden was promoted to lieutenant. Harden stated that she was only promoted after Steve Thompson's promotion was taken away due to alleged misconduct. (Doc. 66-17 at ¶ 12.) In 2012, she was transferred to the Special Operations department. In 2015, Harden was transferred to the Professional Standards Unit ("PSU"). Harden testified that sometime between 2015 and 2017, Scott Conklin "got rid" of a citizen complaint against Michael Cross that Harden had been assigned to investigate. (Harden Depo. at 167:4–20.)

---

[2] According to Harden, Michael Cross had opened a dresser or desk and found the marijuana. He then threw it onto the ground and said it was in plain view. (Harden Depo. at 132:23–133:4.)

In 2017, Harden applied for and was promoted to captain.  She recalled that there were other officers who were qualified for the position, including Stuart.  After the promotion, she acted as the Assistant Bureau Director of the Patrol Operations and supervised six lieutenants.  (Docs. 58 at 8; 66 at 4.)  In November, she was moved to the Criminal Incident Division ("CID").  Harden had concerns about the transfer because she had not worked in the CID previously but she did not believe the change was because she is a female.  In December 2018, she was transferred to the Community Outreach Bureau ("COB") and supervised other officers.  Harden wrote a paper as part of her master's program that included statistics on the role of women in leadership in law enforcement.  (Doc. 58 at 9.)  At that time, she noted that the City's police department was comprised of 87% males and 13% females, which was consistent with the national average.  In 2022, Harden attended the FBI Academy for training.

Sometime between 2021 and 2023, Michael Cross directed Harden to implement a schedule for overtime at the front desk—this directive allegedly came from the Chief.  Harden implemented the directive and Chief Wheeles later informed her that he had never authorized the overtime.  Harden reported the incident to Deputy Chief Haltom.  (Harden Depo. at 137:21–138:19.)  On another occasion during that time period, Harden was out sick when paperwork was due on some new equipment.  Michael Cross advised Harden that he would take care of it, but he did not.  Harden reported the incident to Haltom.  (*Id.* at 139:5–22.)  Also, at some point during COVID-19, officers did not receive certain personal protection equipment due to Michael Cross's lack of following through on obtaining the equipment.  (Docs. 66 at 23; 72 at 8.)

Harden filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 23, 2021. (Doc. 58-6 at 81–83.)  On September 20, 2022, Harden wrote a memo about Lieutenant John Trimble's alleged inappropriate comments he made at the

Citizen's Academy concerning the historical role of women at the department.  As a result, Trimble was removed from teaching at the Academy.  (Harden Depo. at 171:9–172:24.)  This suit was filed in January 2023.  A few weeks later, the City decided to create an opening for the position of major.  The City then decided to fill this position by only considering Harden for the position.  (Docs. 66 at 24; 72 at 9.)  It was never posted.  Chief Wheeles opposed the position because he did not believe a fourth major position was justified.  (Doc. 72-5, Wheeles Depo. at 47:25–48:23.)  Jeralyn Wheeles told other officers that Chief Wheeles was forced to promote Harden by the city manager and did not want to do so.  (Doc. 66-5, J. Wheeles Depo. at 45:3–13; Cross Depo. at 138:12–18.)  Harden would not have been offered the position if it were not for the involvement of the city manager.  (Docs. 66 at 24; 72 at 10.)  Harden testified that Chief Wheeles presented her with a letter detailing the promotion but that Wheeles could not answer questions about her new duties because he needed to get clarification from the City Manager.  After learning that Harden would be promoted to major and Jennifer Cross to captain in 2023, which occurred after the filing of this action, Joe Perry said that he will have to sue the City so that he could get promoted too.  (Harden Depo. at 175:13–21.)  Harden reported this remark to her Major.[3]  (*Id.* at 178:1–4.)  Within the last year, during roll call Harden interrupted a conversation amongst officers where they were expressing that women should not get paid for sports.  Harden addressed the issue but did not report it.  (Docs. 58 at 10; 66 at 4.)  Harden testified that she has not heard Chief Wheeles make any statements that she considered derogatory towards women.  (Harden Depo. at 201:25–202:2.)

Plaintiff Jennifer Cross.  On March 29, 2004, Jennifer Cross began as a patrol officer with the TPD.  In 2008, she transferred to a school resource officer position.  Jennifer Cross testified

---

[3] In their response brief, Plaintiffs include several additional "sexist" comments made by other officers.  (Doc. 66 at 23.)  The record, however, fails to reflect who made those statements, when they were made, and if they were reported.  (Harden Depo. at 173:18–22.)  Therefore, Plaintiffs have failed to show that these statements are material to the claims at issue.

that during her time as a school resource officer, then-Chief Miller talked to her multiple times about breastfeeding, which made her very uncomfortable but she did not report these conversations. (Jennifer Cross Depo., Doc. 58-7 at 28:1–29:8.) In 2009, she received a promotion to a detective position in the CID. Over the next three years, she did not have concerns about her treatment at the TPD. In April 2012, she was promoted to a sergeant in the Field Operations Division ("FOD"). In this role, she directly supervised a group of officers, most of whom were male. (Docs. 58 at 12; 66 at 4.) She also does not recall any concerns with her treatment while employed as a sergeant in the FOD. In January 2015, she was moved to the Criminal Investigations Bureau ("CIB"). She testified that from 2004 to December 2015, she does not recall a situation where she wanted to work in a particular position and was denied the opportunity. (Jennifer Cross Depo. at 56:1–57:7.)

In December 2015, she applied for and was promoted to a lieutenant in the Field Operations Bureau ("FOB"). Jerry Monasmith applied for the same position and was not selected. On the day of the promotion, Jennifer Cross was called to the chief's office. Monasmith came up to her and said "Fancy you being here on promotion day." (*Id.* at 65:12–66:11.) Later that day, he approached her in the parking lot and told her that she was only selected because she was a female and not because she was a better candidate for the position. (*Id.* at 66:22–67:4.) Jennifer Cross did not report this conduct or file a complaint with human resources. She did share it with other people but did not identify who she shared it with. (*Id.* at 67:25.) During her time in this role, she was the third shift watch commander and the highest-ranking position on shift. She was concerned, however, because she was working in the same bureau as her husband, Michael Cross. She voiced her concerns with Acting Chief Kris Kramer (a male) and this resulted in her transferring to the CIB in January 2017. She thought the transfer resolved her concerns about working in a different

bureau than her husband.  (*Id.* at 74:7–76:12.)  She was transferred to the property crime squad of the CIB even though the open position was for the persons crime squad.  She questioned the decision and Bill Cochran told her that she would have to prove herself.  (*Id.* at 79:2–18.)

On another occasion and after checking if she needed to do anything else, she left early to attend a personal event with other members of the police department and family members in Kansas City.  While on her way on the Kansas turnpike, she was called by Lieutenant Sturgeon and told that she needed to come back to help serve a search warrant she had previously worked on.  Jennifer felt that Sturgeon intentionally disrupted her plans because he should have told her that they needed assistance when she had asked earlier.  (*Id.* at 80:1–81:20.)  The following Monday, Cochran called Jennifer into his office and accused her of going over his head and reporting the incident to Kramer.  In response, Jennifer stated that she did not do that but that Kramer was in the vehicle when the incident occurred and overheard it.  Cochran later apologized.  (*Id.* at 82:3–83:11.)  According to Jennifer Cross, Cochran has undermined her authority or circumvented her chain of command on multiple occasions.  She reported most incidents to her chain of command.  Also, Monasmith has routinely addressed her in a manner that caused her to feel that he was undermining or circumventing her authority, such as acting as though he is "babysitting" her, going to her subordinates when she is present, being rude to her in a conversation, and showing up to check on her.  (Cross Depo. at 110:8–112:17.)  Cross testified that she reported most of these incidents with her chain of command.  (*Id.* at 113:11–20.)  In October 2019, she made a report with human resources.  (*Id.* at 113:20–24.)

In November 2019, there was an opening for a front office position.  Jennifer testified that she was supposed to be assigned to the front office position.  (*Id.* at 96:18–97:17.)  Cochran testified that he was considering moving her to that position but Jennifer made a social media post

criticizing Kansas City Chief's Coach Andy Reid and used the word "fucking" in her post. (*Id.*) Jennifer was told that the post "reflected poorly on a commander." (*Id.* at 98:1–2.) Jennifer was then assigned to records and Manny Munoz, a male, was given the front office position. On prior occasions, Munoz has made social media posts using curse words. (*Id.* at 96:18–97:17; Doc. 66-18.) Then-Chief Cochran testified that he selected Munoz because he spoke Spanish and he was trying to expand the Latino outreach. (Doc. 72-8, Cochran Depo. at 20:22–21:12.) Cochran testified he was not aware of the social media posts made by Munoz when he was promoted.[4] (*Id.* at 30:6–31:2.)

In January 2020, she was transferred to another division. She does not believe that this transfer was discriminatory. After the transfer, Haltom advised her that concerns were brought to his attention that she was spending too much time working on her master's degree. Jennifer viewed this as a verbal warning. (Jennifer Cross Depo. at 91:21–93:18.) Jennifer testified that both Monasmith and Michael Cross also were working towards their degrees and spending time doing so while on duty but they did not get a verbal reprimand. (*Id.*) Haltom told her they were not being addressed because no one had complained about them. In that same conversation, Haltom told her to be aware of people's perceptions of her, which she construed as a warning that she was being watched. In February 2020, Plaintiffs and others were at the Strategic Leadership Academy Graduation. At that event, Chief Bill Cochran dropped his napkin and then bent to pick it up. Jennifer testified that he told her that he did that so he could look up Gretchen Spiker's skirt. (*Id.* at 215:3–216:3.)

---

[4] Plaintiffs also introduce evidence that Jennifer Cross was verbally reprimanded for a social media post made some time in 2018 where she was dancing. (Doc. 66 at 27–28.) Plaintiffs assert that other officers were not reprimanded for social media posts. Jennifer's testimony, however, does not specify the other social media posts and she "assumes" that other officers were not disciplined. (Jennifer Cross Depo. at 100:5–18.) Plaintiffs also make no attempt to tie this 2018 incident to the promotions at issue. Therefore, this statement of fact is immaterial to the issues.

In June 2021, she was moved to a lieutenant position in Administration.  She did not have an issue with this transfer.  On December 31, 2021, she submitted her interest for the captain position to the hiring committee.  Jennifer interviewed for the position with a panel that included Harden as one of the panel members.  Jennifer Cross, Monasmith, and Aaron Jones were all marked promotable to captain.  On January 10, 2022, Haltom announced that Monasmith and Jones were selected as the next captains.  (Docs. 58 at 16; 66 at 4.)  Cross believes that she was not hired because of her sex.  (Jennifer Cross Depo. at 164:2–13.)

In April 2022, Jennifer oversaw a departmental in-service.  There were three officers in attendance who were wearing clothes in violation of the dress code: Jeralyn Wheeles (female), Willyard, and Schwin.  Jennifer directed them to go home at lunch and change into proper attire. Before lunch, she received a call from Monasmith advising her that he was told of her directive and he told those officers that they did not need to change.  Jennifer reported to Major Purney that Monasmith had undermined her authority, and Purney told her that she was making a big deal out of nothing.  The next day, more officers showed up inappropriately dressed.  Cross reported this to Haltom and asked for guidance.  He told her to enforce the policy and that he would send an email to all officers informing them that Cross, as the training director, has the authority to enforce the dress code.  He did not send the email after meeting with Major Purney.  Haltom did discuss the issue with Monasmith.  (Docs. 58 at 17; 66 at 4.)  The next day, Jennifer received text messages and emails about the absurdity of the dress code violations.  She reported these to Haltom and said that she was embarrassed and humiliated by the lack of support.  She filed a formal complaint with human resources.  Her complaint that she was subjected to workplace bullying was sustained. Further, the report found that the "overturning of [her] directive served to undermine [her] authority as the Director of Training and is in violation of" city code.  (Doc. 58-8 at 22.)  Although

10

employees who violate the personal conduct policy should be disciplined, Monasmith was never disciplined for his conduct nor did he receive any notification from human resources regarding their investigation. (Docs. 66 at 30–31; 72 at 14.) Jacque Russell, the human resources director, testified that human resources does not administer discipline but that it is up to the department head to administer any discipline. (Docs. 66 at 38; 72 at 19.) She also believed that someone should have spoken to Monasmith about his behavior. (*Id.*) She concluded that the conduct toward Jennifer Cross created an embarrassing and humiliating work environment for her. (Docs. 66 at 30–31; 72 at 14.)

Jeralyn Wheeles also filed a complaint with human resources for retaliation based on being signed out of training by Jennifer Cross. Wheeles' complaint was determined to be unfounded. (Docs. 58 at 17; 66 at 4.)

During her career, Jennifer Cross believes that she was passed over for promotion three times: once for lieutenant and twice for captain. In the last three years, she has not heard Chief Wheeles say anything demeaning or degrading towards women. (Docs. 58 at 18; 66 at 4.) She filed a charge of discrimination on May 23, 2021.[5]

In 2023, Jennifer was promoted to captain after Harden's promotion to major. Chief Wheeles summoned her to his office and handed her an envelope about the promotion. Major Purney told Cross "Congratulations I guess" and that he shouldn't be surprised. (Jennifer Cross Depo. at 204:11–19.) He then told her that the environment at the TPD is for white males to "sit down and shut the fuck up and the only people that matter are the women and the minorities." *Id*.

---

[5] In Plaintiffs' statement of facts, Plaintiffs set forth comments that were viewed by Jennifer Cross as sexist. (Doc. 66 at 26.) Some of those comments, however, lack any evidence as to who made the statements and when they were made. (Plaintiffs' Statement of Facts (SOF) 52, 53.) Therefore, they are not material to the issues herein. Another statement identified by Plaintiffs, fact 51, is inadmissible hearsay as it was a statement made by John Trimble who was allegedly repeating something that Scott Conklin said. (Plaintiffs' SOF 51.) Finally, the statement allegedly made to Jeralyn Wheeles is immaterial as it was not made by a decisionmaker pertaining to the claims herein, was made over twenty years ago, and Wheeles did not report it. (Plaintiffs' SOF 54.)

During Cross and Harden's promotions, Chief Wheeles did not speak about them and their accomplishments, did not shake their hands, and did not take photos.  (Doc. 66 at 32; 72 at 15.) The chief typically does these things during promotion ceremonies.  Wheeles has testified that he did not fully participate in the ceremonies because he was having stomach problems.  (Wheeles Depo. at 230:1–231:10.)

Defendant Chief Wheeles's Relevant Employment History.  On December 13, 2018, Chief Wheeles was selected by then-Chief Cochran as Deputy Chief.  This resulted in a direct chain of command between himself and his wife, Jeralyn Wheeles.  In accordance with policy, Topeka City Manager issued a directive that complaints pertaining to Jeralyn would follow a different chain of command.  In 2021, Cochran retired and Wheeles became the Interim Chief of Police.  He was then selected as the chief on November 23, 2021.  After being named chief, the policy regarding complaints concerning Jeralyn was again changed to reflect a chain of command to avoid Chief Wheeles.  (Docs. 58 at 10–20; 66 at 4.)

Kim Hanika.  Plaintiffs have also offered several facts regarding Kim Hanika's experience while employed at TPD.  (Doc. 66 at 39–40.)  Those facts involve a conflict between Hanika and Jeralyn Wheeles.  According to Hanika, Jeralyn Wheeles was upset about information Hanika put in a warrant.  (Doc. 66-13, Hanika Depo. at 26:20–27:5.)  Hanika was then placed on administrative leave.  Hanika filed a complaint against both Jeralyn and Chief Wheeles regarding their actions relating to the conflict which Hanika believed to be retaliatory.  The facts regarding the result of the investigation are in dispute.  (Docs. 66 at 39–40; 72 at 19–20.)  According to Hanika, she was retaliated against because of her conflict with Jeralyn Wheeles.  (Hanika Depo. at 34:18–25.) Hanika believes that the retaliatory conduct included elimination of a task force that she was a part of.  (*Id.* at 39:19–40:7.)

Relevant Policies.  The City has a policy which prohibits unlawful employment practices based on sex and other protected categories.   The City also has a policy that requires its employees to report any suspected violation of the discrimination policy to human resources.  Plaintiffs have acknowledged receipt of these policies.

With respect to hiring for the positions of lieutenant, captain, major, and deputy chief, the TPD policy provides that the Chief of Police and City Manager "shall determine the evaluation and selection process" for the candidates.  (Doc. 58-10 at 10.)

Deputy Chief Position.   Shortly after becoming chief, Wheeles considered several candidates for the position of Deputy Chief without conducting interviews and without providing an opportunity to indicate an interest in the position.  (Stuart Depo. at 81:11–82:7.)  The practice of selecting a candidate for this position was historically done without an interview process and the chief ultimately selected the person in whom he had the most confidence to fill in as chief in his absence and would be best for his command staff.  (Doc. 58-4 at 2, Chief Wheeles's Affidavit.) The position description sets forth the following required qualifications: be a certified police officer in Kansas; have a bachelor's degree; a master's degree is preferred but equivalent experience may be substituted; successful completion of an extended management training program; 5 years of command-level experience; 5 years of supervisory experience; and a valid driver's license.  (Doc. 58-3 at 19.)

The qualified internal applicants considered by Wheeles included Major Klumpp, Captain Michael Cross, Captain Harden, Captain Stuart, and Captain Haltom.  (Chief Wheeles' Depo., Doc. 58-12 at 63:10–15.)  The weight and importance of a commander having a master's degree is up to each chief and Wheeles does not require his commanders to have a master's degree. Former Chief Cochran had previously required his majors to have a master's degree.  (Docs. 58 at

21; 66 at 4.)  On November 29, 2021, Wheeles announced that he had selected Haltom as Deputy Chief.  Haltom's qualifications included the following: he began his career in 1999 with the TPD; he had a bachelor's degree; he had attended the Law Enforcement Leadership Academy and Northwestern Command Police School; had been a captain since February 24, 2018; had served in both the FOB and CIB; he had worked on the response team in several ranks; he received previous honors and awards.  (Docs. 58 at 21–22; 66 at 4.)  In addition to the background set forth herein, Stuart's additional qualifications included a master's degree in industrial and organizational psychology, and attendance at the same trainings as Haltom and additionally at the Kansas Police Administrator's Seminar.  Harden's additional qualifications not previously noted included: a master's degree and attendance at the same academies as Haltom and also at the FBI Academy. (Docs. 58 at 22–23; 66 at 4.)

        In evaluating the internal candidates, Chief Wheeles considered their experience with the TPD, experiences working with him, and any other qualifications that he knew.[6]  (Doc. 58-4 at 2.) Wheeles stated that he chose Haltom because he believed that he was the most capable choice and because he had a high level of confidence in his capability as a commander.  (Doc. 58-16 at 2.) He had several years' experience with Haltom in which they had successful collaborations, a proven track record of sound decision-making under pressure, an impeccable record, highly respected in the community, and they shared a similar vision for the mission and priorities of the

---

[6] Plaintiffs attempt to controvert this fact by citing to Stuart's testimony that there was not a process that allowed for others to be considered and to Harden's testimony that other people were more qualified.  (Doc. 66 at 12.)  This evidence does not controvert this fact.  Stuart's testimony concerns the lack of notice to be considered which has nothing to do with what Chief Wheeles did consider when he reviewed the internal candidates.  Harden's testimony merely states her belief that she was more qualified than Haltom.  Harden does not identify any other candidate, specifically a female candidate, that was qualified and who Wheeles failed to consider for the position.

TPD.[7]  (*Id.*)  Pursuant to policy, Chief Wheeles made the promotion recommendation to the City Manager who approved Haltom's promotion.  (Doc. 58-11 at 3.)

_2021 Major Promotion_.  On November 30, 2021, Chief Wheeles notified Michael Cross, Harden, and Stuart that there was a new major position open and informed them of the selection process.  The job description applicable to the position requires the candidates to have the following qualifications: high school degree or equivalent; ten years of law enforcement experience with at least five years in a supervisory position of increasing complexity; Kansas Law Enforcement Certification; and a valid license.  (Doc. 58-3 at 34.)  Michael Cross, Harden, and Stuart all interviewed for the position before an interview panel comprised of City employees and community members.  The panel was all male.  (Doc. 66 at 36; 72 at 17.)  The panel had form questions and took notes during the interviews.  At the conclusion, each panelist identified whether the applicant was "promotable" or "not promotable."  (Docs. 58 at 25; 66 at 4.)  Harden was marked promotable to major by all panelists.  Cross was marked promotable to major by all but one panelist, Major Klumpp.  (Doc. 58-12, Chief Wheeles Depo. at 51:17–52:18.)  Major Klumpp marked both yes and no in response to the question as to whether Cross was promotable.[8]  *Id.* Michael Cross was selected by Chief Wheeles for the promotion.  Prior to the promotion, Chief Wheeles could not recall hearing anyone say anything "bad about Michael Cross" to him.  (Chief Wheeles Depo. at 146:4–6.)

---

[7] Again, Plaintiffs attempt to controvert this fact by citing to the above referenced testimony.  (Doc. 66 at 13.)  This testimony does not controvert Wheeles's explanation for his decision.

[8] In their reply, Defendants argue that the handwritten notes say Cross was not ready for promotion for major in the "Executive and CIS.  Needs more experience in these bureaus."  (Doc. 72 at 4.)  Defendants, however, do not cite to the record in support of this statement.  Defendants then argue that because the position was in the Field Operations Bureau that the indication of not promotable is not relevant because it pertained to different bureaus.  Because the record citations do not point to the handwritten file and because the parties have not put forth uncontroverted evidence that such a distinction is dispositive as it appears officers switch to different bureaus, the court has not considered this evidence.

Stuart testified that her interview was not one of her better interviews.  (Stuart Depo. at 101:18.)  Two community panelists marked Stuart as "not ready for promotion to major."  (Docs. 58 at 26; 66 at 4.)  Stuart has no information that would lead her to believe that the panelists were pressured or influenced in their decisions.  (*Id.*)  Stuart also testified that she believed that Harden was better qualified than she was for the promotion.  She further testified that she does not recall Michael Cross making a statement that she viewed as demeaning towards women.  (Stuart Depo. at 94:1–8.)

At the time of the promotion, Michael Cross had been employed by the TPD since 2001, was working on his master's degree, had attended the Northwestern Command Police School, served in the military, had been a captain since July 2015, and was acting major for approximately three months in 2017.  (Docs. 58 at 25; 66 at 13.)

In reviewing the applicants, Chief Wheeles looked at their resumes, personnel files, rank history, and notes from the interview panelists.  (Chief Wheeles Depo. at 71:5–25.)  Plaintiffs attempt to controvert this testimony with Stuart's testimony and assert that "the selection of Michael Cross had already been made at the time of the announcement of the major position." (Doc. 66 at 14.)  Stuart's testimony does not support such a statement.  Stuart testified that she felt like "perhaps the selection had already been made," because Michael Cross "had been given several opportunities to work through difficult challenges that he had been successful at that really showed probably what they were looking for in a major.  And so I felt that would bring him above." (Stuart Depo. at 94:21–95:7.)  This testimony does not support a finding that Wheeles had already made the selection prior to his consideration of all of the materials.

Deputy Chief Haltom advised Wheeles that Michael Cross had far and away performed the best in the interview process.  (Docs. 58 at 27; 66 at 4.)  Major Purney also testified that Michael

Cross had performed the best during the interviews. Former Chief Cochran testified that he believed he could give an assignment to Michael Cross and knew that it would be done 150 percent. (*Id.*) Stuart testified that there were concerns about Michael Cross's work ethic and whether he could be trusted. (Stuart Depo., Doc. 66-2 at 138:2–141:24.) Stuart said that she had heard these concerns voiced by Major Gilchrist, Major Klumpp, and Deputy Chief Haltom. (*Id.*) Haltom testified that he told Chief Wheeles when they were discussing the candidates that he "had concerns with the reputation that Mike Cross carries with him with some people within the agency" and Cross "may not have the trust of everyone." (Haltom Depo., Doc. 72-2 at 12:18–13:9.) Haltom testified that Chief Wheeles understood his concern, "recognized it," and "validated [his] concern." (*Id.* at 13:12–14.) Harden also testified that in the two years prior to the promotion, Michael Cross came to work late, left early, and took long lunches. (Harden Depo. at 130:15–131:3.) She testified that he was not a team player because he "was never there." (*Id.* at 131:9.) She also testified that Michael Cross had lied to her in the past. (*Id.* at 131:18–23.)

Chief Wheeles stated that he choose Michael Cross for the position because of his experience in the military; experience within the TPD; experience with difficult personnel matters; proven track record of making good operational and tactical decisions; good reputation in the community; excellent public speaking ability; leadership record; and excellent assignment completion history. (Doc. 58-16 at 2–3.) Plaintiffs attempt to controvert this statement on the basis of Stuart's testimony that she believed the selection was previously made. (Doc. 66 at 15.) That testimony does not controvert Wheeles' stated reasons for Cross' selection. Plaintiffs also point to Harden's testimony that she believes she was better qualified for the position. Harden's testimony about her subjective beliefs does not controvert Wheeles' statements about why he made his decision.

17

After Cross's promotion, both Harden and Stuart had a conversation with Haltom in which they told him that they felt they were passed over and did not receive the promotion because they were women.  Harden asked Haltom what she could do in the future with respect to the process. In response, Harden testified that Haltom stated "he really didn't know, that he'd talk to Chief." (Stuart Depo., Doc. 66-3 at 146:21–23.)  He then remarked that, "I know the elephant in the room is why Mike got promoted."  (*Id.* at 147:8–9.)  Haltom testified that he didn't remember making that comment and it is not something he would typically state so he disputes it.  (Haltom Depo., Doc. 72-2 at 46:17–47:8.)

2018 and 2022 Captain Promotions.  There are two promotions to the captain position that are at issue in this case.  The captain position requires the following qualifications: Kansas Law Enforcement Certification; ten years of police management/supervision, including five years of administrative law enforcement experience; and a valid driver's license.  Jennifer Cross applied for the 2018 position but was not selected.  At that time, both Stuart and Haltom were selected and promoted in February 2018.  Cross testified that she believed that she, Stuart, and Haltom were equally qualified.  (Docs. 58 at 28; 66 at 4.)  Cross testified that she asked Cochran and Wheeles why she was not selected for the position.  She further testified that they informed her that the "determining factor was [her] lack of a master's degree."  (Jennifer Cross Depo. at 162:19–20.) When she said that Haltom did not have a master's degree either, she was told that he was selected because "it was just his time."  (*Id.* at 162:20–23.)

In 2021, another position became available.  Jennifer Cross applied for the position again along with ten other applicants.  After the panel interview, Cross, Monasmith, and Aaron Jones were all marked promotable.  Haltom recommended to Chief Wheeles that Jones and Monasmith be promoted.  Haltom testified that he knew about one complaint against Monasmith for rudeness

"or maybe more than one complaint about rudeness," but he also testified that he does not believe Monasmith has engaged in a pattern and practice of discriminating against females.  (Doc. 66-10 at 2.)  Chief Wheeles had no knowledge of any complaints against Monasmith at the time of the promotion.  (Chief Wheeles Depo. at 27:2–18.)   Harden was on the interview panel for this position.  She testified that she did not think Monasmith would do well in this position because he was set in his ways.  Also, due to her previous role in PSU, Harden had access to Monasmith's disciplinary files which included complaints from the public involving racial profiling, harassment, and excessive force.  She further testified that there were complaints that were sustained.  (Harden Depo. at 166:20–25.)

At the time of his promotion, Monasmith had the following qualifications: an officer with the TPD since 1995; a master's degree in Public Administration; employed at the rank of lieutenant since August 2016; extensive military service for 28 years and had been previously deployed in combat zones; he received five commendations during his time with TPD; he also received numerous military awards and honors.  (Docs. 58 at 30–31; 66 at 4.)  Jennifer Cross's qualifications included the following: an officer with the TPD since March 2004; a master's degree in public administration; employed at the rank of lieutenant since December 2015; and attended the Law Enforcement Leadership Academy Command School.  (Docs. 58 at 31; 66 at 4.)

Chief Wheeles stated that he selected Jones because of his experience, public speaking ability, proven track record, high level of community engagement, past successful collaborations, and an excellent reputation in the community, city leadership, and the TPD.  (Doc. 58-16 at 3.)  Chief Wheeles stated that he selected Monasmith because of his seniority at the TPD, longstanding military service, experience while at TPD, proven track record of good decisions in high stress situations, outstanding public speaking; good community engagement; track record of leadership

19

at TPD and in the military, and an excellent reputation. (*Id.*) Jennifer Cross attempts to dispute this fact by pointing to Harden's testimony that she was more qualified. (Doc. 66 at 16.) Although Jennifer Cross may introduce evidence of facts to show that these reasons are implausible or contradictory and show evidence of pretext, she has not disputed the fact that these are the reasons Wheeles gave for selecting Monasmith.

Plaintiffs' Claims. Plaintiffs filed this action asserting three claims: 1) failure to promote because of sex in violation of Title VII against the City; 2) violation of 42 U.S.C. § 1983 against Defendant Wheeles in his individual capacity; and 3) violation of 42 U.S.C. § 1983 against the City for having a policy or practice of not promoting qualified candidates because of their sex. (Doc. 48 at 18–19.) Defendants now move for summary judgment on all claims. Wheeles also asserts he is entitled to qualified immunity on the claims against him.

## II.  Standard

Summary Judgment. Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 935 F.2d 1106, 1110 (10th Cir. 1991). When facing summary

judgment, a plaintiff cannot rest upon her complaint to satisfy her burden.  *Anderson*, 477 U.S. at 256.  The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.   Analysis

### A.  Surreply

Plaintiffs have filed a motion for leave to file a surreply.  (Doc. 73.)  Surreplies are not typically permitted and are only allowed in rare circumstances, including where the movant raises a new argument in a reply brief.  *See Dodson Int'l Parts, Inc. v. Williams Int'l Co., LLC*, 2020 WL 4904049, *1 (D. Kan. 2020).  Plaintiffs contend that leave should be granted because Defendants have "attempted to reverse the evidentiary burdens the parties possess at this stage[,] they have misstated the record; and, [] they misstate the relevant law and record concerning 'pretext.'"  (Doc. 73.)  None of these reasons are sufficient for the court to permit a surreply.  Therefore, Plaintiffs' motion for leave is denied.[9]

### B.  Sex Discrimination under Title VII

All three Plaintiffs assert that the City discriminated against them in violation of Title VII by failing to promote them to certain positions because of their sex.  To succeed on this claim, a plaintiff "must prove that *intent* to discriminate *based upon* [the] plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022).  Plaintiffs may either rely on direct evidence of "discrimination or use the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792" (1973).  *Id.*  Here, Plaintiffs are relying on the burden-

---

[9] The court notes that its decision reflected herein would not be changed even if the court considered the surreply.

shifting framework of *McDonnell Douglas* as they lack any direct evidence of sex discrimination. To state a prima facie case of discrimination under this standard, each plaintiff must demonstrate that "(1) she belongs to a protected class; (2) she applied for an available position for which she was qualified; (3) she was rejected under circumstances which give rise to an inference of unlawful discrimination." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).  This burden is not onerous. *Id.*  The burden then shifts to the City to proffer a "legitimate non-discriminatory purpose for the adverse employment action." *Id.* at 1216–17.  If the City meets this burden, the burden shifts back to Plaintiff to show "her sex was a determinative factor in the [] employment decision, or show[s] the [employer's] explanation for its action was merely pretext." *Id.* at 1217.  Here, the City concedes that Plaintiffs have met their prima facie burden with the exception of Stuart's claim pertaining to the 2021 major position.

### i.    Failure to Plead Exhaustion

Defendants initially move for dismissal of Plaintiffs' Title VII claim on the basis that they failed to plead exhaustion in their complaint and is not set forth in the pretrial order.  (Doc. 58 at 33.)  Defendants concede, however, that Plaintiffs did exhaust their claim.  Even though they concede exhaustion and include facts related to Plaintiffs' EEOC charge in their motion, Defendants assert this claim must be dismissed because Plaintiffs failed to allege exhaustion in their complaint and it is absent from the pretrial order.  In response, Plaintiffs now move to amend their complaint to add an allegation regarding exhaustion.  (Doc. 65.)

In support of their argument, Defendants cite to *Watson v. Republic Airlines, Inc.*, 553 F. Supp. 939, 943 (N.D. Ga. 1982).  (Doc. 58 at 33.)  In *Watson*, the court noted that the plaintiff in that case admitted that "she never filed a charge with the EEOC."  553 F. Supp. at 943.  *Watson* is not persuasive to the court.  Defendants fail to cite any authority for the proposition that an action

must be dismissed if the plaintiff failed to allege exhaustion even when the parties all concede that the plaintiff has exhausted administrative remedies.  In light of the undisputed facts herein, the court declines to grant summary judgment on this basis.  It is clear that Defendants have known for an extensive period of time that Plaintiffs exhausted their administrative remedies.  The failure to make the specific allegation in their complaint or include it in the pretrial order is not fatal at summary judgment.  As a result, Plaintiffs' motion to amend (Doc. 65) is denied as moot.[10]

### ii.   Exhaustion

Next, Defendants move for summary judgment as to any discrete employment action that occurred more than 300 days before the filing of their EEOC charge.  (Doc. 58 at 47.)  Title VII makes it unlawful for an employer to discriminate against an employee on the basis of (among other things) the person's sex, color, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Before an employee may bring suit on such a claim, the employee must exhaust administrative remedies by filing a timely charge with the EEOC identifying the parties and describing the practices complained of.  *Jones v. Needham,* 856 F.3d 1284, 1289 (10th Cir. 2017).  Under Title VII, a plaintiff must file an EEOC charge regarding each discrete employment act complained of within 300 days of the unlawful employment act.  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1228 (10th Cir. 2022).  A failure to promote is a discrete employment act that requires exhaustion.  *EEOC. Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 688 (10th Cir. 2018).

Here, Plaintiffs filed an EEOC charge on May 23, 2021.  Therefore, Defendants ask the court for summary judgment on any alleged unlawful failure to promote that occurred more than 300 days before May 23, 2021, which is July 27, 2020.  Plaintiffs do not respond to this argument.

---

[10] The court further notes that the pretrial order controls the course of the proceedings.  Fed. R. Civ. P. 16(d). Therefore, Plaintiffs should have moved to modify the pretrial order instead of the complaint.

The court finds that Defendants are entitled to summary judgment for any alleged failure to promote that occurred prior to July 27, 2020.

iii.     **Deputy Chief Position**

Both Stuart and Harden assert that they were not selected for the deputy chief position because of their sex.  Both contend that they are more qualified than Haltom and that he was only promoted because he is a male.  (Doc. 48 at 5–6.)  The City moves for summary judgment on this claim on the basis that it has a legitimate non-discriminatory reason for selecting Haltom and that Stuart and Harden cannot show that this reason is pretext for discrimination.

With respect to this position, the undisputed facts show that Chief Wheeles considered the following individuals for the position: Major Klumpp, Captain Michael Cross, Captain Harden, Captain Stuart, and Captain Haltom.  Chief Wheeles did not conduct interviews and did not provide candidates with an opportunity to express interest in the position.  Historically, the selection of this position was done without an interview process, and the chief ultimately selected the person in whom he had the most confidence to be chief in his absence and who would be best for his command staff.  Wheeles stated that he chose Haltom because he believed that he was the most capable choice and because he had a high level of confidence in his capability as a commander.  (Doc. 58-16 at 2.)  He had several years' experience with Haltom in which they had successful collaborations and they shared a similar vision for the mission and priorities of the TPD.  Haltom also had a proven track record of sound decision-making under pressure, an impeccable record, and was highly respected in the community.  (*Id.*)  The court finds the City has met its burden by putting forth a legitimate non-discriminatory reason for the selection of Haltom for the position.

In response, Plaintiffs make no attempt to argue that they have shown that this reason was pretext for discrimination.  Rather, Plaintiffs conclusively state that all of Plaintiffs' statements of

facts—"paras. 3–175"—present "voluminous evidence" of pretext.[11]  (Doc. 66 at 44.)  Apparently,

Plaintiffs expect the court to make arguments on their behalf.  This is not the court's duty.  *See*

*United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after

all, to make arguments for a litigant that he has not made for himself.") (Gorsuch, J.); *Drake v.*

*City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) ("the court will not construct arguments

or theories for the plaintiff in the absence of any discussion of those issues.")

Reviewing the introduction section of the brief, Plaintiffs state that "[a]lthough Stuart and

Harden were more qualified and experienced, Defendant Wheeles chose Jamey Haltom as his

deputy chief in late November 2021."  (Doc. 66 at 3.)  While a disparity in qualifications can

establish pretext, to do so, Plaintiffs must demonstrate an "overwhelming merit disparity."  *Ford*,

45 F.4th at 1219.  Plaintiffs must "*assure*" the court "that the plaintiff is better qualified than the

other candidates for the position."  *Id.*  "Minor differences in qualifications will not demonstrate

pretext because it is not our role to act as a super personnel department that second guesses

employers' business judgments."  *Id.*  Further, a plaintiff's own belief that she was more qualified

is not enough to show pretext.  *Id.*

Here, there are only minor differences in qualifications.  All three had been employed with

the City for a similar length of time and all had been captain for at least three years.  Although

Haltom did not have a master's degree, it was not required for the position.  It is undisputed that

Haltom had the required qualifications for the position.  Plaintiffs have not shown that there was

an overwhelming merit disparity in this promotion decision.  With respect to the hiring process,

---

[11] Plaintiffs' response brief contains only two pages of argument and one of those pages is devoted to the summary judgment standard.  (Doc. 66 at 43–44.)  The majority of Plaintiffs' brief is composed of the statement of facts section. Notably, although the court granted Plaintiffs' motion to extend the page limitations to 60 pages, Plaintiffs only filed a 45-page brief.  (Doc. 61.)  For some unknown reason, Plaintiffs wholly failed to respond to all of Defendants' arguments on summary judgment and conclusory stated that there was a dispute of fact as to their claims.  The court is limited, however, in that it cannot grant summary judgment based on a failure to respond.  Therefore, the court will review the claims on the merits to determine if Plaintiffs' claims survive summary judgment.

although Plaintiffs make inferences that it was somehow discriminatory because it was done without interviews, the undisputed evidence is that the selection was historically made in the same process and that it complied with City policy. While Plaintiffs have put forth evidence of potential differential treatment and stray comments by individuals who were not decision makers on this hiring prior to the promotion, Plaintiffs have wholly failed to make any argument as to why those incidents show pretext.[12]   Therefore, the court will not consider those issues. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) ("Because Antonio does not explain the pretextual connection between her termination for job abandonment and Johnson's attendance or lack of attendance at training, we do not consider this issue further.")(citing *Am. Airlines v. Christensen*, 967 F.2d 410, 415 n. 8 (10th Cir. 1992) (declining to consider issues lacking reasoned argument)).

Further, Plaintiffs argue that Hanika's treatment by Jeralyn Wheeles and Chief Wheeles shows that he has discriminatory intent. (Doc. 66 at 2.)   Plaintiffs fail to fully develop this argument. The uncontroverted facts are that Hanika had a conflict with Jeralyn Wheeles which led to allegedly retaliatory treatment. Plaintiffs have not put forth evidence that Wheeles has a discriminatory animus towards women such that his explanation for his decision is called into

---

[12] In Plaintiffs' statement of facts, Plaintiffs set forth several statements that "Stuart was subjected to hearing" from "various male members of the TPD." (Doc. 66 at 17–18.) Those statements, however, fail to provide any context whatsoever. There is no indication who made the statements, when they were made, if they were made to Stuart or another female, if they were reported, or if Chief Wheeles knew about the comments. Defendants assert that the statements are not material. The court agrees. Given the lack of any information about the speaker, time period, and whether they were reported, they are not material to Stuart's failure to promote claim because there is no way for the court to determine that the statements were tied to the decision. *See Antonio*, 458 F.3d at 1184. Stuart also set forth three instances of differential treatment in her statement of facts. (Doc. 66 at 18–19.) These include an officer asking for dispatch to send him another officer during a call when he found out that Stuart was going to be the officer dispatch initially sent, that some patrol officers would not let female partners get into physical altercations or they would fail to support the female officers during altercations, and during her initial training, a field officer didn't want to ride with her due to his wife's objections. Again, these statements are not material to the issues in this case. There is no context to provide the date of these events, the officers involved, or whether they were reported.

doubt.  Rather, the evidence is that the alleged retaliation stemmed from a conflict between Jeralyn Wheeles, the Chief's wife, and Hanika; not because Hanika was a woman.

Therefore, the court finds that Plaintiffs have failed to put forth evidence that the City's stated reason for hiring Haltom over Stuart and Harden is pretext for discrimination.

### iv.   2021 Major Position

Next, both Stuart and Harden[13] assert that the City discriminated against them by failing to promote them to major in 2021 and instead promoting Michael Cross.  With respect to Stuart, the City argues that she has not set forth a prima facie case because she was marked not promotable by two panel members as a result of her interview performance.  (Doc. 58 at 39.)  Plaintiffs, however, have set forth evidence that Michael Cross was also marked not promotable by one panel member.  Therefore, there is a dispute of fact as to whether being "not promotable" in the eyes of a panel member disqualifies an individual for a promotion.  The court finds that Stuart and Harden have established a prima facie case of discrimination.

The City contends that it hired Michael Cross over Stuart and Harden because of his experience in the military; experience within the TPD; experience with difficult personnel matters; a proven track record of making good operational and tactical decisions; a good reputation in the community; excellent public speaking ability; his leadership record; and excellent assignment completion history.  The court finds that the City has set forth a legitimate non-discriminatory reason for promoting Michael Cross.

Next, although Plaintiffs have not set forth a specific argument of pretext, the court finds that a review of the facts in a light most favorable to Plaintiffs show that the "employer's proffered

---

[13] In the pretrial order, Harden asserts that she was discriminated against when the City failed to select her for the SWAT team between 2002 and 2006 and when she was passed over for a promotion in 2015.  (Doc. 48 at 7.)  These claims are precluded because she did not timely exhaust her administrative remedies as to these discrete employment acts.

explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).   As noted, there is evidence that one panel member marked Michael Cross as unpromotable.   There is also evidence that Michael Cross had a reputation as being untrustworthy which was brought to Wheeles' attention prior to his selection.   Further, there was evidence that Michael Cross did not complete tasks assigned to him during his career.   There was also evidence that during the two years prior to the promotion he was consistently late to work, left early, and took long lunches.   This evidence casts sufficient doubt on the City's explanation for its decision.

Therefore, the court finds that Plaintiffs have put forth sufficient evidence to create a dispute of fact as to pretext.   In sum, the court finds that Plaintiffs have created a dispute as to whether their denial of a promotion was based on their sex.   Defendants' motion for summary judgment on this claim is denied.

### v.   Cross's Claim

Cross contends that the City failed to promote her to captain in 2021 because of her sex.[14] Defendants move for summary judgment on the basis that they have a legitimate non-discriminatory reason for promoting Monasmith and Jones instead of Plaintiff.   According to Wheeles, he promoted Jones because of his experience, public speaking ability, proven track record, high level of community engagement, past successful collaborations, and excellent reputation in the community, city leadership, and the TPD.   (Doc. 58-16 at 3.)   He selected Monasmith because of his seniority at the TPD, longstanding military service, experience while at TPD, proven track record of good decisions in high stress situations, outstanding public speaking; good community engagement; track record of leadership at TPD and military, and excellent reputation.   (*Id.*)

---

[14] Cross also asserts that she was not promoted to captain in 2018 because of her sex.   (Doc. 48 at 8.)   This alleged failure to promote is not actionable as Cross did not timely exhaust her administrative remedies.

Cross asserts that she was more qualified and experienced than Monasmith and Jones. (Doc. 66 at 3.) Cross, however, makes no attempt to set forth how her qualifications show that she was overwhelmingly more qualified than Monasmith and Jones. *Ford*, 45 F.4th at 1219. The undisputed facts show that both officers had extensive experience and met the qualifications for captain. In Cross's proposed facts, she asserted that she was more qualified because she already had her master's degree, "had more experience," "did well in her interview," is "smart," and has served in all the bureaus on a number of different levels. (Doc. 66 at 31.) Most of these proposed facts are subjective beliefs. With respect to her master's degree, it is undisputed that a master's degree was not required for the position. With respect to her assertion that she has more experience and service on different levels, Cross fails to explain how her experience compared to Monasmith and Jones is so vastly overwhelming that the court is assured that she was the better candidate. *Ford*, 45 F.4th at 1219.

Cross also contends that Monasmith was a bully and harassed her but that he was not disciplined. With respect to her complaints about Monasmith, the 2015 incident in the parking lot was never reported. The other incident occurred in April 2022 which was after the captain selection. Therefore, it is not relevant to this promotion.

Cross also put forth facts that Harden had information regarding complaints against Monasmith based on her prior position in PSU. Harden, however, failed to specifically identify the complaints and the time period at issue. (Harden Depo. at 166:20–25.) Moreover, Harden sat on the interview panel and marked Monasmith as "promotable." Therefore, she must have believed that whatever the complaints were, they did not preclude the promotion. Further, there is no evidence that she relayed her concerns about the complaints to anyone on the panel or

Wheeles.  The undisputed fact is that Wheeles did not have knowledge of any complaints against Monasmith at the time of the promotion.  (Chief Wheeles Depo. at 27:2–18.)

The court declines to comb through over 30 pages of facts and search for potential evidence of pretext on Cross's behalf because Plaintiffs failed to make specific arguments in response to Defendants' summary judgment.  The court merely notes that although Cross has identified instances where she has been treated differently by other individuals and identified inappropriate remarks, Cross has failed to argue that such evidence is sufficient to show pretext.  And isolated comments or remarks are insufficient to show pretext unless they are tied to the decision.  *See Antonio*, 458 F.3d at 1184; *Plotke v. White*, 405 F.3d 1092, 1107 (10th Cir. 2005) (noting that, at the pretext stage, the plaintiff "simply must show a nexus between the allegedly discriminatory statements and the employer's decision.")  Moreover, comments made by non-decision makers are not material to show pretext.  *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

In any event, Cross has wholly failed to show or make any argument that certain actions or statements by others show pretext for Wheeles' decision.  Therefore, the court declines to consider this issue as it was not addressed by Cross.  *Antonio*, 458 F.3d at 1184.  The court finds that the City is entitled to summary judgment on Cross's claim of failure to promote to captain in 2021.

### C.  Section 1983 Claims Against Wheeles

Plaintiffs have also asserted claims under 42 U.S.C. § 1983 against Wheeles for violating their right to equal protection in failing to promote them because of their sex.  Section 1983 claims utilize the same *McDonnell Douglas* framework that is used under Title VII.  *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995).  Therefore, based on the decision herein, Wheeles is

entitled to summary judgment on all claims except for Stuart and Harden's claims regarding the 2021 major position.

Wheeles has moved for summary judgment on the remaining claims on the basis of qualified immunity. Individuals sued in their individual capacities under § 1983 may assert qualified immunity. *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016). The "assertion of qualified immunity creates a presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). Once qualified immunity is asserted, the burden shifts to the plaintiff to show that the defendant violated a constitutional right that was clearly established at the time of the conduct. *Guiterrez*, 841 F.3d at 900. "When a defendant moves for summary judgment based on qualified immunity, a plaintiff must show a violation of clearly established law because, [u]nlike most affirmative defenses, the plaintiff bear[s] the ultimate burden of persuasion to overcome qualified immunity." *Id.* (internal quotation and citation omitted). If, and only if, a plaintiff meets this burden, then the traditional summary-judgment burden shifts back to the defendant to show there is no genuine issue of material fact for trial. *Rojas v. Anderson*, 727 F.3d 1000, 1004-05 (10th Cir. 2013).

Here, Plaintiffs do not respond to the assertion of qualified immunity by Wheeles.[15] Therefore, the court finds that Wheeles is entitled to qualified immunity on Stuart and Harden's claims against him. *See Gutierrez v. Cobos*, 841 F.3d 895, 903 (10th Cir. 2016) (affirming grant of summary judgment when plaintiff failed to make any "legal argument in the district court to rebut qualified immunity."); *Pfannenstiel v. Kansas*, No. 5:21-CV-04006-HLT, 2023 WL 4623848, at *10 (D. Kan. July 19, 2023) (same).

### D. Section 1983 Claim against the City

---

[15] Plaintiffs make no reference to their § 1983 claim against Wheeles in their response brief. Therefore, the court alternatively finds that Plaintiffs have waived this claim.

Finally, Plaintiffs brought a section 1983 claim against the City.  The City moves for summary judgment on the basis that Plaintiffs cannot show that the City has a policy of gender discrimination.  Municipal liability requires more than a violation by one of the municipality's officers.  Plaintiffs must sufficiently allege: (1) that a violation was committed by an officer; (2) that there is a municipal policy or custom; and (3) a "direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006).  A policy or custom includes the following: 1) a "formal regulation or policy statement;" 2) an informal custom that amounts to a widespread and well-settled practice; 3) a decision of an employee with final policymaking authority; 4) ratification by a final policymaker of a subordinate's decision; or 5) "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

In response to the motion for summary judgment, Plaintiffs argue that their "experience of gender discrimination and the similar experiences of other female TPD officers show the TPD's (and Defendants Wheeles') pattern and practice of gender discrimination.  Such a pattern and practice show that Defendants' gender discrimination is and was a policy, practice or custom of the Defendants."[16]  (Doc. 66 at 2.)  Again, Plaintiffs have wholly failed to respond to Defendants' arguments which are extensive.  The pretrial order states that this claim is based on the City's policy of failing to promote qualified candidates because of their sex in violation of the Equal Protection Clause.  (Doc. 48 at 18.)  As set forth herein, however, the only claims which survive summary judgment involve the decision by Wheeles to promote Michael Cross to major instead

---

[16] Based on this statement, it appears that Plaintiffs are arguing that there is an informal custom that amounts to a widespread and well-settled practice.  Plaintiffs make no argument that there is a policy based on Wheeles being an employee with final policymaking authority.  Again, the court will not craft arguments for Plaintiffs.

of Harden and Stuart.  Plaintiffs have failed to show that they were not promoted to other positions because of their sex.  Plaintiffs also attempt to put forth evidence that two other females, Kim Hanika and Donna Eubanks,[17] did not get promoted because of their sex.  (Doc. 66 at ¶¶ 151, 171.) These facts, however, are only supported by Hanika and Eubanks' personal opinions.  (*Id.*)  As stated herein, an employee's own subjective beliefs are not sufficient to create a dispute of fact. *Ford*, 45 F.4th at 1219.  Plaintiffs have not put forth any additional evidence regarding these promotions in order for the court to determine whether this evidence would show the existence of a policy of discrimination.  Rather, the evidence in this case clearly shows that women, including Plaintiffs, have been consistently promoted.  While Plaintiffs have created a dispute of genuine material fact as to whether they were discriminated against in the 2021 Major promotion, they have not put forth sufficient evidence to show that the City has a **policy** of discriminating against women in promotions.

Therefore, the City is entitled to summary judgment on this claim.[18]

### E.  Damages

Defendants also assert that Plaintiffs' damages must be limited because there was only one position of major and Harden recently accepted a promotion to major.  Again, Plaintiffs fail to respond to this argument.

---

[17] Plaintiffs offer several facts regarding Eubanks' personal experience while employed at TPD.  Notably, none of those facts set forth a time period and most of them are conclusory.  Doc. 66 at 41–42 ("Eubanks is perceived differently than her male counterparts." "Captain Monasmith treats females differently than he treats males.")  Further, none of the facts suggest that Wheeles had any knowledge of differential treatment.  The court finds the facts regarding Eubanks' experience immaterial to the issues in this case and do not support a finding that there is a policy of failing to promote women.

[18] Although Plaintiffs' argument section is sparse, their conclusory arguments suggest that the alleged policy is broader than the policy identified in the pretrial order.  The pretrial order controls the course of these proceedings.  Fed. R. Civ. P. 16(d).  The claim set forth therein is that the policy at issue is one of failing to promote women.  Therefore, to the extent that Plaintiffs claim that the City has a general policy of treating women differently than males in all other respects, such a claim was not preserved in the pretrial order.

Defendants assert that Harden and Stuart would be limited in their damages because only one position was available. In support, they cite to authority from the Eleventh Circuit where the court utilized a formula to make plaintiffs whole when there were more plaintiffs than positions. *See Shealy v. City of Albany, Ga.*, 137 F. Supp. 2d 1359, 1365 (M.D. Ga. 2001); *United States v. City of Miami*, 195 F.3d 1292, 1301 (11th Cir. 1999). In *Shealy*, the court had already conducted a bench trial but set a damages hearing for a later date. In *Miami*, the court ordered relief to the entire class of 35 officers and the Eleventh Circuit remanded the case and ordered the court to award each officer a pro rata share of the monetary value of the promotions. The court does not find these cases persuasive at this juncture. This issue is more appropriate for post-trial briefing.

With respect to the limitation of Harden's damages, the court orders the parties to file in limine briefs on this issue. Given that Harden is already in the position of major, the court is inclined to limit any potential back pay award to the time period between the 2021 appointment of Michael Cross and Harden's promotion to major in 2023. However, because there are no facts as to whether her pay would be the same, i.e. if she would have received increases, the court cannot determine as a matter of law that she would not be entitled to back pay after her promotion in 2023.

Therefore, the motion to limit Plaintiffs' damages is denied without prejudice.

**F. Motions to Determine Place of Trial**

Plaintiffs designated Kansas City for trial and Defendants designated Topeka. The parties have filed briefs in support of those designations.

D. Kan. Rule 40.2(e) provides that "[t]he court is not bound by the requests for place of trial. It may determine the place of trial upon motion or in its discretion." In considering a motion for intra-district transfer, the court generally looks to the same factors relevant to motions for change of venue under 28 U.S.C. § 1404(a). *See Spires v. Hospital Corp. of America*, 2006 WL

34

1642701, at * 1 (D. Kan. 2006).  Section 1404(a) provides as follows: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The party seeking transfer has the burden of proving that the existing forum is inconvenient.  *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992). The plaintiff's choice of forum is typically not disturbed unless the balance weighs in favor of a transfer.  *Id.*  However, this standard is based on the assumption that the plaintiff resides in the forum and is inapplicable if the plaintiff does not reside in the forum.  *See, e.g., Vanmeveren v. International Business Machines Corp.*, 2005 WL 3543179, *2 (D. Kan. 2005) ("a plaintiff's choice of forum receives less deference when it is not also her residence"); *Schecher v. Purdue Pharma L.P.*, 317 F. Supp. 2d 1253, 1263 (D. Kan. 2004).  The court considers the following factors in ruling on the motion: (1) plaintiff's choice of forum; (2) convenience of the witnesses; (3) accessibility of witnesses and other sources of proof; (4) the possibility of obtaining a fair trial; and (5) any other practical considerations that make a trial easy, expeditious, and economical.  *See Schecher*, 317 F. Supp. 2d at 1261 (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991)).

Here, although Plaintiffs designated Kansas City for trial, Plaintiffs reside in Topeka. Therefore, Plaintiffs' forum choice is not accorded much weight.  Further almost all of the witnesses reside in Topeka.  As such, it is not convenient for the witnesses to travel an hour away to appear at trial.  Plaintiffs argue that Kansas City is the best location for the trial because there is "potential for an unfair trial" in Topeka based on four articles published in the paper about the case. (Doc. 56 at 3.)  According to Plaintiffs, those articles were published last year and included allegations from the pretrial order and the complaint.  Plaintiffs, however, fail to articulate how the jury pool has been tainted by these articles to the extent that a trial must be held in Kansas City

when all the other factors weigh in favor of Topeka.  Further, any potential concerns of juror bias due to the media coverage can be addressed during voir dire of prospective jurors.  *See Jones v. Wichita State Univ.*, No. 06-2131-KHV, 2007 WL 1173053, at *2 (D. Kan. Apr. 19, 2007).

Because this case has only a tangential connection to Kansas City, there is little difficulty in finding that Topeka is a more convenient forum.

## IV.    Conclusion

Defendants' motion for summary judgment (Doc. 57) is GRANTED IN PART and DENIED IN PART.  The City's motion is denied as to Harden and Stuart's Title VII claim with respect to the 2021 major promotion.  It is granted in all other respects.  Defendant Wheeles' motion is granted in its entirety.

Plaintiffs motion for leave to file a surreply (Doc. 73) is DENIED.  Plaintiffs' motion to amend (Doc. 65) is DENIED AS MOOT.  Plaintiffs' motion to determine the place of trial as Kansas City (Doc. 55) is DENIED and Defendants' motion to determine the place of trial as Topeka (Doc. 53) is GRANTED.

IT IS SO ORDERED.  Dated this 9th day of August, 2024.

__s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE