In the United States District Court
for the District of Kansas

_____

Case No. 23-cv-02021-TC

_____

COLLEEN STUART, ET AL.,

*Plaintiffs*

v.

TOPEKA, KANSAS, CITY OF, ET AL.,

*Defendants*

_____

**MEMORANDUM AND ORDER**

Following a jury verdict finding that the City of Topeka, Kansas, discriminated against Colleen Stuart and Jana Harden, Doc. 113, Stuart and Harden move for an award of attorney fees under Title VII. Doc. 128. The City opposes the motion, disputing both the number of hours claimed and the rates requested. Doc. 139. For the following reasons, the motion is granted in part and denied in part, and Stuart and Harden are awarded $279,852.50 in attorney fees.

**I**

**A**

Under the American Rule, parties ordinarily bear their own attorney fees. *Lackey v. Stinnie*, 604 U.S. 192, 192 (2025). Congress has created limited statutory exceptions to that rule, including in Title VII, which authorizes an award of a "reasonable attorney's fee" to a prevailing party. 42 U.S.C. § 2000e-5(k).

Determining a reasonable fee follows a two-step inquiry. First, the fee applicant must establish prevailing-party status. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Second, the applicant must demonstrate that the amount requested is reasonable. *Blum v. Stenson*, 465 U.S. 886, 897 (1984). The "most useful starting point" for determining a reasonable

1

fee is the lodestar calculation, which is the product of multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley*, 461 U.S. at 433; *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010). The fee applicant bears the burden of proof at each step. *Flitton*, 614 F.3d at 1178. A lodestar fee calculation is presumed reasonable. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). But that presumption does not end the inquiry: In certain circumstances, the lodestar may be adjusted upward or downward to account for the particularities of the suit and its outcome. *Zinna v. Congrove*, 680 F.3d 1236, 1242 (10th Cir. 2012).

When evaluating potential adjustments, courts consider the twelve factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1193 (10th Cir. 2023). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the attorney-client relationship; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

The Tenth Circuit has emphasized that many of these considerations overlap with the lodestar calculation process. *Robinson*, 160 F.3d at 1281. Indeed, many *Johnson* factors may be absorbed in the lodestar calculation such that the Tenth Circuit has declined to find error when a district court does not explicitly invoke the factors or when it considers only those factors "most applicable to [a given] case." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1196 n.44; *see also Anchondo v. Crenshaw & Assocs., LLC*, 616 F.3d 1098, at 1103–04 ("[I]t has only become clearer that the lodestar determination is primary and that the propriety of such a determination is not automatically called into doubt merely because the trial court did not expressly discuss the *Johnson* factors.").

## B

Familiarity with the factual background of this dispute is presumed. *See generally* Docs. 77 & 140. Relevant to this motion, Colleen Stuart, Jana Harden, and Jennifer Cross sued the City of Topeka and former Police Chief Bryan Wheeles in 2023. Doc. 1. They alleged that

the City denied them promotions within the police department because of their gender, in violation of Title VII and 42 U.S.C. § 1983. Doc. 1.[1] The Complaint included claims under Section 1983 against Wheeles in his individual capacity and sought to impose liability on the City pursuant to *Monell* for Wheeles's acts and omissions. *Id.* During summary judgment, a Memorandum and Order dismissed all of Cross's claims and all of the Section 1983 theories, leaving only Stuart and Harden's Title VII failure-to-promote claims for trial. Doc. 77.

The case proceeded to a four-day jury trial. The jury found that the City discriminated against Stuart and Harden when it failed to promote them in 2021. Doc. 113. It awarded each of them $200,000 in compensatory damages. The jury also returned an advisory verdict on equitable relief, recommending back pay and front pay for Stuart and back pay for Harden. *Id.* The verdict was adopted in part, reducing equitable relief to reflect that only one promotion was available in 2021. Doc. 140. After trial, the City moved for judgment as a matter of law and sought a new trial, but both requests were denied. *Id.*

Stuart and Harden now move for attorney fees, seeking $915,162.50 for 1,379.35 hours billed by four attorneys. Doc. 128. The parties have met pursuant to Local Rule 54.2 and Stuart and Harden filed a statement of consultation after failing to reach an agreement with the City regarding the fee award. Doc. 127. Stuart and Harden timely filed their motion pursuant to Federal Rule of Civil Procedure 54(d)(2). In support of their motion, Stuart and Harden submitted billing records, affidavits from their counsel, and affidavits from other lawyers in the Kansas City metropolitan area. Docs. 128-1–128-5. The City filed a response opposing the motion, asserting many deficiencies in the requests. Doc 139. In support of its response, the City submitted affidavits from its counsel and from other lawyers in Shawnee County, Kansas. Docs. 139-1–139-9. Stuart and Harden did not file a reply.

## II

Stuart and Harden qualify as a prevailing party. But a reduction is necessary given their billing entries, their requested rates, and the

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

3

success they obtained. Accordingly, their motion is granted in part and denied in part.

## A

Substantively, Title VII authorizes courts, in their discretion, to award "a reasonable attorney's fee (including expert fees) as part of the costs" to prevailing parties. 42 U.S.C. § 2000e-5(k). A party qualifies as prevailing by securing relief that materially alters the legal relationship between the parties and carries the necessary judicial imprimatur. *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) (prevailing status exists where a judgment "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff"); *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998) (explaining that the plaintiff prevails by obtaining "an enforceable judgment on the merits" that materially alters the relationship).

Stuart and Harden qualify as prevailing parties. They obtained a jury verdict against the City on their Title VII claims, resulting in enforceable money judgments and equitable relief. Doc. 113. That outcome materially altered the parties' legal relationship, provided concrete relief that directly advanced the purposes of Title VII, and satisfied the prevailing party requirement. *See Farrar*, 506 U.S. at 111–12 (concluding that judgment that provides actual, enforceable relief qualifies as prevailing); *see also Robinson*, 160 F.3d at 1280 (holding that judgment on the merits materially altering relationship establishes prevailing party status). This satisfies the first element of obtaining an attorney fee pursuant to Title VII.

## B

Once a party qualifies as prevailing, the inquiry shifts to whether the requested amount represents a reasonable fee. For the reasonableness analysis, the Supreme Court instructs courts to begin with the lodestar calculation, which entails multiplying the hours reasonably expended by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). The party seeking fees bears the burden of proving the reasonableness of the hours worked and the rates charged. *Flitton v. Primary Residential Mortg., Inc.,* 614 F.3d 1173, 1178 (10th Cir. 2010). The following subsections consider those two variables in turn.

**1**

Fees may be awarded only for the number of hours reasonably expended on the litigation. *Hensley*, 461 U.S. at 433. Counsel must exercise billing judgment and exclude any time that is excessive, redundant, or unnecessary. *Id.* at 434. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Id.* (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc)) (emphasis in original). The Tenth Circuit enforces this rule by requiring proof that each hour was necessary and by cutting time that does not meet that standard. *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1203 (10th Cir. 1986). The City argues that several factors weigh against crediting Stuart and Harden's counsel for the 1,379.35 hours they request. In large measure, the City is correct.

**a**

For one, the City argues that the fee application from Stuart and Harden reflects redundant staffing and duplicative work. Doc. 139 at 7. Courts "should examine [the potential duplication of services] in determining the reasonableness of hours expended." *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983). Under such analysis, courts scrutinize whether multiple lawyers performed distinct roles or merely duplicated one another's work. *Id.*; *see also Robinson v. City of Edmond*, 160 F.3d 1275, 1285 (10th Cir. 1998) (defining "duplicative work" as instances where "more than the necessary number of lawyers are present for a hearing or proceeding or when multiple lawyers do the same task"). If multiple attorneys bill for an activity, such as attending a hearing, "when one would suffice," compensation should be denied for the "excess time." *Ramos*, 713 F.2d at 554–55

Stuart and Harden's attorneys frequently engaged in this type of excessive and duplicative staffing. Multiple attorneys, for example, billed to attend and participate in the same depositions. *See, e.g.*, Doc. 128-1 at 17; Doc. 128-2 at 9, 10; Doc. 128-4 at 8. They likewise billed to attend the same scheduling conferences, *see, e.g.*, Doc. 128-1 at 13; Doc. 128-2 at 6, and meetings with clients, *see, e.g.*, Doc. 128-3 at 12; Doc. 128-4 at 6. Attorneys also often billed in parallel to review the same email traffic. *See, e.g.*, Doc. 128-1 at 12; Doc. 128-2 at 6; Doc. 128-3 at 12. All attorneys billed to attend the trial, with three of them billing at attorney rates for the activity. *See, e.g.*, Doc. 128-1 at 11; Doc.

128-2 at 17; Doc. 128-3 at 21–22; Doc. 128-4 at 11–12. And there are more entries just like that without any indication, explanation, or justification for what necessitated the participation of several attorneys or what distinct contributions each made. That is problematic, as the Tenth Circuit has recognized that "the presence of more than two lawyers during trial or the presence of more than one lawyer at depositions and hearings must be justified to the court." *Ramos,* 713 F.2d at 554 n.4. That Stuart and Harden fail to justify these redundancies suggests a reduction is appropriate. *Id.* at 554–55.

Notably, the City's attorneys billed for more total hours than Stuart and Harden's attorneys are seeking. Stuart and Harden seek compensation for 1,379.35 hours of legal services. Doc. 128 at 3. The City contends that is an unreasonable number of hours, but concedes its attorneys billed more hours than Stuart and Harden are seeking. Doc. 139 at 7. Generally, that would undermine the persuasiveness of the City's claim that the staffing decisions made by Stuart and Harden's attorneys were per se excessive. Courts may look at how many lawyers the other side used in similar situations as an indication of the effort required, *Case,* 157 F.3d at 1250 (internal citations omitted), and courts should consider "the responses necessitated by the maneuvering of the other side." *Robinson,* 160 F.3d at 1281 (quoting *Ramos,* 713 F.2d at 554). Although the City's lawyers claim to have been paid for working more hours than Stuart and Harden are seeking, this does not eliminate Stuart and Harden's burden of proving the reasonableness of their requested hours, *Flitton,* 614 F.3d at 1178. As noted below, the numerous other defects identified in Stuart and Harden's billing records cast into doubt the reliability of the total hours they have requested.

**b**

The City argues that poor record-keeping practices by Stuart and Harden's counsel also warrant an hour reduction. Doc. 139 at 9–10. Fee requests require "meticulous, contemporaneous time records." *Ramos,* 713 F.2d at 553. Submitted "records must reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks—for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on." *Id.*

Stuart and Harden's records frequently fall short of this standard. Consider, for example, that Stuart and Harden seek $915,162.50 in attorney fees, but the underlying billing records they offer to justify their

6

request total only $900,617.50 without any discernable explanation for this discrepancy. Doc. 139-1 at 7. This unexplained difference raises suspicion as to the accuracy of the request.

In addition, there are indications that the records were not contemporaneously kept for each attorney. There are numerous time entries that appear to have been copied verbatim between Mark and Christie Jess, including instances where Mark Jess's records refer to himself in the third person, suggesting that these are post-hoc descriptions instead of contemporaneous records of events. *See, e.g.*, Doc. 139-1 at 2 ¶ 9 (noting the verbatim copying issue); Docs. 128-1 at 22 & 128-2 at 13 (showing identical "Review MJ [Mark Jess] email to Clients").

And, the application is riddled with block billing. Many of the entries frequently combine multiple tasks attributable to an attorney in a single entry for entire days or occasionally weeks. *See generally* Doc. 139 at 9–10; *see also* Docs. 128-1–128-5. This practice is commonly referred to as block billing. *Robinson*, 160 F.3d at 1284 n. 9. Block-billing "camouflage[s] the work a lawyer does naturally and quite correctly raise[s] suspicions about whether all the work claimed was actually accomplished or whether it was necessary. This concern is particularly important in a situation where a party is seeking to have his opponent pay for his own lawyer's work." *See Robinson*, 160 F.3d at 1284; *see also Flying J. Inc. v. Comdata Network, Inc.*, 322 F. App'x 610, 617 (10th Cir. 2009) (citing *Robinson*, 160 F.3d at 1284) (noting that block billing can provide "strong evidence that a claimed amount of fees is excessive"). The City cataloged 192 block-billed entries by Stuart and Harden's counsel that account for nearly half the hours submitted (661.8 of 1,379.35). Doc. 139 at 10; Doc. 139-1 at 20–114. Stuart and Harden neither rebut nor contest this assertion.

Individually, the deficient billing practices are concerning, but many of these failures occur simultaneously, such as block billing entries that are so vague they conceal the nature of the underlying activity. For example, Mark Jess's entry spanning September 1, 2023, to November 8, 2023, reads "Prepare for depositions of B. Wheeles, Monasmith, Haltom, Purney, Cochran, Mudrick, Wade, J. Wheeles" and bills a total of 14 hours without identifying what that preparation involved or how much time preparation for each deponent required. Doc. 128-1 at 17. Another entry reads "Prepare examinations of B. Wheeles, W. Cochran, J. Haltom, J. Monasmith," claiming to have spent 19 hours in the same day. Doc. 128-1 at 18.

Finally, there is reason to believe counsel did not consistently keep contemporaneous records. For one, Christie Jess stated that she allegedly had to review her and Mark Jess's calendars to reconstruct hours for the final bills. Doc. 139-3 at 2 ¶14. Likewise, the fact that different attorneys have identical, verbatim time entries for the same tasks strongly suggests some of them created the records retroactively. These practices create serious concerns about record accuracy. *Ramos*, 713 F.2d at 553 n.2 ("[R]econstructed records generally represent an overstatement or understatement of time actually expended.").

* * *

These issues, especially in combination, suggest a reduction is necessary. Indeed, the Tenth Circuit has held that a similar lack of precision and contemporaneousness in situations similar to those identified in this case warrants an hour reduction. *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (finding 35 percent reduction justified where "sloppy and imprecise time records failed to document adequately how plaintiffs' attorneys utilized large blocks of time"); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1235 (10th Cir. 2000) (finding 33 percent reduction justified with "lumping of tasks into large blocks of time, with its concomitant lack of specificity and possibility of overlap with the work of other attorneys, and the failure to maintain the time records contemporaneously").

### c

The City also highlights the fact that several entries reflect tasks not reasonably compensable at attorney rates. Doc. 139 at 10. It is plain that attorneys should not bill at an attorney rate for "purely clerical or secretarial tasks." *Hensley*, 461 U.S. at 434 n.9; *see also Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1256 (D. Kan. 2017). Courts must consider the nature of services provided. *Blum v. Stenson*, 465 U.S. at 895 n.11. The "dollar value [of a task that requires no legal expertise] is not enhanced just because a lawyer does it." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n.10 (1989).

Stuart and Harden's counsel repeatedly billed for tasks that are not generally compensable at attorney rates. For example, they seek attorney fees for undertaking administrative tasks such as gathering files, downloading files, saving files, printing files, and bringing files to the court clerk. *See e.g.*, Doc. 128-1 at 17, 19; Doc. 128-2 at 5, 10; Doc. 128-4 at 8. These are tasks that courts in this district have recognized do

not merit attorney-rate compensation. *Fox*, 258 F. Supp. 3d at 1256 ("[T]he court must deduct tasks that amount to filing, organizing files, making copies, printing, ordering file folders, organizing boxes, updating files with correspondence and pleadings, and preparing files for storage.").

The scope and magnitude of this issue is difficult to estimate on the current record. The reason for this difficulty is because the time records often block billed for these administrative tasks along with other, substantive legal work. Christopher Playter's entries are a good example of this problem: He records 10.5 hours of time to "[r]eview all of Defendants documents and pull for exhibits; highlight and notate questions; draft depo outlines for Russell, Maisberger, and Eubanks; print all additional exhibit copies." Doc. 128-4 at 8. Similar tasks were often lumped in the same entry as substantive legal tasks like reading and reviewing legal documents or discussing legal documents with clients or cocounsel. *See, e.g.*, Doc. 128-2 at 15–16.

The request for travel time also merits discussion. The Tenth Circuit has held that an attorney's travel time should be compensated at a reduced hourly rate. *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir. 1990) (affirming decision to reduce fees based on the "determination that an attorney's driving time, while necessary, is essentially unproductive and, therefore, compensable at a reduced hourly rate"). Yet Stuart and Harden frequently billed at attorney rates for travel and seek full compensation for the entirety of the time. *See, e.g.*, Doc. 139-1 at 3–7. Moreover, the scope of this improper request is difficult to calculate because their records almost exclusively block billed travel along with other, substantive legal work. One of many such entries for Mark Jess, for example, spans September 16 through September 19 and bills 38 hours ($32,300) to "[a]ttend Court for jury trial incl travel." Doc. 128-1 at 18. Stuart and Harden's attorneys also repeatedly lumped travel with depositions, client meetings, attorney meetings, document review, writing, reading emails, and many other tasks. *See, e.g.*, Doc. 128-2 at 10; Doc. 128-3 at 12; Doc. 128-3 at 22. There is a need to reduce their requests to reflect the "unproductive" nature of the activity. *Smith,* 921 F.2d at 1122. How much of a reduction is unclear. The City's best attempts to disentangle the records suggests that Stuart and Harden's counsel billed 69 hours and $44,485 for time spent traveling in the case, Doc. 139-1 at 7, which does not appear to be an unreasonable estimate albeit based on incomplete information.

Finally, many of Stuart and Harden's time entries seek compensation for ancillary activities. These include multiple entries for reviewing and responding to news media requests involving the case, which do not advance the litigation. *See, e.g.*, Doc 128-1 at 12. Notably, all courts of appeal that have considered the question of billing for media interactions have disallowed billing for the activity unless it materially contributes to litigation goals. *See, e.g.*, *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994); *Greater Los Angeles Council on Deafness v. Cmty. Television of S. Cal.*, 813 F.2d 217, 221 (9th Cir. 1987); *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir. 1986). District courts in the Tenth Circuit have reached a similar conclusion. *See, e.g.*, *Utah Int'l, Inc. v. Dep't of Interior*, 643 F. Supp. 810, 831 n.41 (D. Utah 1986) (concluding that hours spent on the "public relations aspect of [a] case, *i.e.,* time spent by counsel communicating with the press and other news media" is not compensable); *David C. v. Leavitt*, 900 F. Supp. 1547, 1557 (D. Utah 1995) (finding that billing for communications directed to a class in a class action lawsuit via the media was appropriate given "the difficulty of communicating with such a widely-spread group"). More generally, hours billed must reflect substantive legal work, *Blum*, 465 U.S. at 895 n.11, be "reasonably expended in the litigation," *Ramos*, 713 F.2d at 553; and be "necessary to achieve the results obtained," *Hensley*, 461 U.S. at 441. On its face, correspondence with the press does not count as any of the above. Even if this and other ancillary activities did advance the litigation result, Stuart and Harden's filings include nothing to establish that reasonableness of the hours billed for them. Thus, they fail to meet their burden of demonstrating it is compensable. *Hensley*, 461 U.S. at 433–34; *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1233 (10th Cir. 2000).

* * *

The foregoing three categories apply to a substantial portion of the hours claimed. A minimum of 100 hours reflect clear duplication of work, and the true figure is almost certainly higher because vague descriptions prevent precise itemization.[2] Block-billed entries account for

---

[2] While discussing every redundant staffing decision is not practical here, consider the number of lawyers billing at attorney rates to attend the trial and the same depositions and hearings. Three of Stuart and Harden's lawyers billed at attorney rates to attend the trial: Mark Jess billed 38 hours, Eric Playter Billed 45.9 hours, and Christopher Playter billed 32 hours. Doc. 128-3 at 21–22; Doc. 128-3 at 21–22; Doc. 128-4 at 11–12. As for hearings, Eric

nearly half the hours submitted (661.8 of 1,379.35). *See* Doc. 139-1 at 20–114. As noted above, the records also raise concerns about contemporaneous tracking: Counsel repeated identical descriptions across timekeepers and allegedly acknowledged reconstructing time from calendars, which limits confidence in the accuracy of the submissions. The entries likewise do not separate compensable attorney time from clerical work, travel time, or other nonlegal tasks. Based on the descriptions and the City's estimates, Stuart and Harden's counsel likely billed between 100 and 200 hours for such nonlegal work at attorney rates. *See* Doc. 139-1 at 20–114.

Given the volume, pervasiveness of the errors, and structure of the entries submitted, it is not feasible to extract only the unreasonable time and leave the remainder intact. But even if such extraction were possible, it would not be prudent. *Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants."). Rather, across-the-board reductions are appropriate. *See, e.g.*, *Hensley* 461 U.S. at 438 n.13 (finding to be proper a general 30 percent reduction of attorney's hours); *Mares*, 801 F.2d at 1203 (finding district court did not err by generally reducing hours by 77 percent and refusing to isolate and analyze every hour assigned to different tasks by counsel).

In light of the aforementioned deficiencies, a 25 percent across-the-board reduction in hours claimed is both reasonable and conservative. As noted above, the defects affect over half the hours billed and are structured in a way that prevents verification even though Stuart and Harden have the burden of establishing their entitlement to a

---

Playter billed 12.9 hours to attend the same pretrial hearing that Christopher Playter billed to attend. Doc. 128-3 at 20; Doc. 128-4 at 10. Likewise, Mark Jess billed 1.7 hours in connection with a similar hearing for which Christie Jess also billed. Doc. 128-1 at 21; Doc. 128-2 at 13. Concerning depositions, one entry for Christie Jess billed 28 hours to "Attend deposition of Bryan Wheeler, Monasmith, Hanika," Doc. 128-2 at 10, which were all depositions attended by other attorneys. Doc. 128-1 at 17; Doc. 128-4 at 8. Christie Jess billed 6.7 hours for a deposition with Jeralyn Wheeles that Mark Jess also billed to attend. 128-2 at 10; Doc. 128-1 at 17. Christy Jess also billed 8.4 hours to attend a deposition of Plaintiff Harden and 8.1 hours to attend a deposition of Plaintiff Stuart. Doc. 128-2 at 9. Christoper Playter billed to attend the same depositions. Doc. 128-4 at 8. Given *Ramos*'s rule of thumb that two attorneys at trial and one attorney at a deposition or hearing are adequate, *Ramos*, 713 F.2d at 554 n.4, these decisions alone amount to roughly 100 hours of duplication of work.

reasonable fee. As a result, the total hours claimed are reduced pro rata by one-fourth before calculating the lodestar. *Carter v. Sedgwick Cnty., Kan.*, 36 F.3d 952, 956 (10th Cir. 1994) ("[T]he court may make a general reduction in hours claimed to achieve what the court perceives to be a reasonable number.").

### 2

The lodestar calculation requires determining a reasonable hourly rate for each attorney. A reasonable rate reflects the prevailing market rate in the local community for similar services by lawyers of reasonably comparable skill and experience. *Blum*, 465 U.S. at 895 n.11; *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996). Courts apply this standard by examining rates charged in the community where the litigation occurs. *Ramos*, 713 F.2d at 555. A court's job is "to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Case*, 157 F.3d at 1257 (quoting *Steinlauf v. Continental Ill. Corp. (In re Continental Ill. Sec. Litig.)*, 962 F.2d 566, 568 (7th Cir.1992)). The moving parties bear the burden of demonstrating that their requested rates align with those prevailing in the market. *United Phosphorus, Ltd.*, 205 F.3d at 1234.

Both parties here attempt to establish different prevailing market rates. Generally speaking, the prevailing market rate is a function of market standards in the specific community where the litigation occurs regarding the price for similar services performed by attorneys of reasonably comparable skill, experience, and reputation. *See Blum*, 465 U.S. at 895 n.11; *Case*, 157 F.3d at 1256; *Ramos*, 713 F.2d at 555.

### a

Before discussing the parties' differing views on applicable rates, it is helpful to summarize the professional pedigrees to contextualize the basis for their requested rates. Mark Jess has practiced law since approximately 1990, giving him 34 years of experience at the time of trial. Doc. 128-1 at 1–2. For roughly 31 of those years, his practice has focused on employment litigation. *Id.* at 1. Before opening Employee Rights Law Firm in 2003, he was a partner at Bryan Cave LLP, where he headed the firm's Labor and Employment Department in its Kansas City office. *Id.*

Christie Jess graduated from Oklahoma City University School of Law in 1993 and has practiced law since then, giving her 31 years of

experience at the time of the trial. Doc 128-2. She has been a partner at Employee Rights Law Firm since 2009, and states that her practice is devoted primarily to representing plaintiffs in employment discrimination, retaliation, and whistleblower matters. *Id.* at 1–2. She explains that due to a hearing impairment, she does not examine witnesses at trial and instead performs support functions during trial at a reduced rate. *Id.* at 3.

Eric Playter graduated from the University of Missouri–Kansas City School of Law in 2005, giving him 19 years of experience at the time of the trial. Doc. 128-3 at 1. He states that after several years practicing insurance defense, his practice shifted to representing individuals in personal-injury and employment-discrimination matters, and that since September 2013 the vast majority of his practice has been devoted to preparing for and trying civil litigation matters in state and federal court. *Id.*

Christopher Playter graduated from the University of Missouri–Kansas City School of Law in 2012, giving him 12 years of experience at the time of the trial. Doc. 128-4 at 1. He states that his employment-law experience began during law school as a clerk at a firm devoted to employment discrimination litigation and that he continued that work after graduation. *Id.* at 1–2. Since forming Playter & Playter, LLC in September 2013, he states that more than ninety percent of his practice has been devoted to civil litigation in state and federal court. *Id.* at 2.

**b**

Stuart and Harden's counsel seek rates they contend are consistent with their Kansas City, Missouri practice. They request an $850 hourly rate for Mark Jess, $760 rate for Eric Playter, $600 rate for Christie Jess, and a $550 rate for Christopher Playter. For Christie Jess's work as paralegal, they request a $150 hourly rate. In support of their argument that these requested rates are reasonable, Stuart and Harden principally rely on affidavits from their own counsel describing their experience, prior fee awards in Missouri state courts, and anecdotal assertions that similarly experienced employment litigators charge rates ranging from $250 to $950 per hour. *See generally* Doc. 128-1; Doc. 128-2; Doc. 128-3; Doc. 128-4; Doc. 128-5; Doc. 128-6. They also attach materials from the *Missouri Lawyers Media* survey and related compilations to support their arguments. Doc. 128-1 at 27; Doc. 128-3 at 23.

The City has a different view. It contends that the requested rates are unreasonable because they are inconsistent with the prevailing rates in Topeka, Kansas, where the dispute arose and trial occurred. They provide affidavits from Topeka practitioners and their own billing records to show that Topeka rates are materially lower than those Stuart and Harden request. *See* Doc. 139-1; Doc. 139-2; Doc. 139-3; Doc. 139-4; Doc. 139-5; Doc. 139-6; Doc. 139-7. The City likewise relies on materials from the *Missouri Lawyers Media* survey and related compilations to support their arguments. Doc. 139-8; Doc. 139-9. The City also points to recent attorney fees decisions in the District of Kansas to contend that a different—lower, not surprisingly—prevailing rate exists. Doc. 139 at 12–13. Given this evidence, the City argues that the reasonable hourly rates for Stuart and Harden's counsel are as follows: $450 per hour for Mark Jess; $300 per hour for Eric Playter; $300 per hour for Christie Jess's work as an attorney and $150 per hour for her work as a paralegal; and $250 per hour for Christopher Playter. Doc. 139 at 15.

Considering the submitted evidence and arguments, Stuart and Harden fail to demonstrate that their requested rates align with those prevailing in the Topeka market. The following analysis will discuss each rate individually. But before proceeding to that analysis, a few important observations deserve discussion.

First, while they submit various types of evidence, Stuart and Harden do not anchor their rates in the District of Kansas. Their affidavits do not demonstrate what attorneys in this District actually command for comparable work, which is Stuart and Harden's burden. *Blum*, 465 U.S. at 895 n.11; *Malloy*, 73 F.3d at 1018. Absent evidence that paying clients in Kansas have accepted these rates or that courts in this District have approved them in contested proceedings, statements about market conditions in other jurisdictions are insufficient to establish a prevailing rate in this matter. *Case*, 157 F.3d at 1257. A fee-seeking plaintiff must provide market-tested rates. *Id.* That Stuart and Harden's counsel reside outside the District of Kansas and Topeka is immaterial. *Contra* Doc. 128 at 5; *see Ramos*, 713 F.2d at 555 ("Absent more unusual circumstances than we see in this case, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area.").

Second, the City's arguments about its own lawyers' rates are largely unhelpful for establishing a prevailing rate. To assert that Stuart and Harden's proposed rates are too high, the City highlights the

discrepancy between the rates at which its attorneys billed and the rates Stuart and Harden propose. Doc. 139 at 13. This is unpersuasive. "Although the rate charged by the losing counsel may be relevant in determining a reasonable hourly rate, [the Tenth Circuit has] discounted that information where . . . the opposing counsel represents a governmental entity." *Sussman v. Patterson,* 108 F.3d 1206, 1212 (10th Cir. 1997). This is because the economics for defense counsel representing governmental entities are fundamentally different: Private "attorneys often charge lower rates to the government because of counterbalancing benefits such as repeat business, and '[w]here the facts show this, the fee charged by a government attorney is simply irrelevant to the establishment of a reasonable hourly rate for a plaintiff's civil rights lawyer.'" *Case,* 157 F.3d at 1257.

Third, reliance on legal publications, including the *Missouri Lawyers Media* survey and related compilations, is unpersuasive. For one, Stuart and Harden's submission puts some of their attorneys' rates at the highest rates for Missouri, Doc. 128-3 at 23, but the relevant legal market is the District of Kansas. *Ramos,* 713 F.2d at 555 (stating that the relevant market is where "the litigation occurs"). Moreover, other courts have found the *Missouri Lawyers Media* methodology to be flawed because it relies on standard billing rates rather than actual judicially approved awards and lacks essential breakdowns by attorney experience or litigation forum. *Ross v. Pentair Flow Techs., LLC*, No. 2:18-02631, 2021 WL 5493072, at *3 (D. Kan. Nov. 22, 2021); *M.B. v. Howard*, 555 F. Supp. 3d 1047, 1064 (D. Kan. 2021).

Fourth, while Topeka and Shawnee County, Kansas, rates are informative, they are not outcome determinative. The City argues that Shawnee County rates ought to apply. Doc. 139 at 5. But no binding authority adopts a categorical rule to that effect. *Cf. Erickson v. City of Topeka*, 239 F. Supp. 2d 1202, 1209–10 (D. Kan. 2002) (considering the fact that litigation occurred in Topeka relevant in determining rates for the District of Kansas); *Pipeline Prods., Inc. v. Madison Cos., LLC*, No. 18-2476, 2019 WL 4305762, at *4 (D. Kan. Sept. 11, 2019) (declining to treat the Topeka trial location as outcome-determinative and explaining that "the Tenth Circuit has not held that the relevant community is limited to a specific metropolitan area where the case is designated for trial").

Fifth, the third-party affiants fundamentally disagree on the prevailing market rate. Stuart and Harden's affiants suggest a top rate of $850 per hour is consistent with the prevailing rate. *See* Docs. 128-5–

15

128-6. The City's affiants suggest the prevailing ceiling is around $500 per hour. *See* Docs. 139-4–139-7. Thus, looking to other sources of "competent market evidence," as the analysis does below, is appropriate to resolve such disagreements. *Case*, 157 F.3d at 1257.

### c

With these precepts in mind, it is possible to set an hourly rate for the attorneys. Mark Jess, who served as lead trial counsel, seeks $850 per hour, but a $500 hourly rate is reasonable. After reviewing previous attorney fee awards in the District of Kansas and considering the record, a rate of $850 per hour substantially exceeds a reasonable hourly rate in the District of Kansas. Stuart and Harden fail to suggest that any court in this District has endorsed an $850 rate for any attorney, regardless of experience. Nor do they identify any market basis for making Mr. Jess the exception in this case. Instead, a survey of recent award rates in this District suggests rates around $500 per hour are reasonable for senior partner-level work. *Roadbuilders Mach. & Supply Co. v. Sandvik Mining & Constr. USA, LLC*, No. 2:22-2331, 2024 WL 757154, at *5 n.27 (D. Kan. Feb. 23, 2024) (collecting cases). That determination frames the reasonableness of the rates being sought by the other lawyers.

Eric Playter seeks $760 per hour, but that is also too high. Instead, an hourly rate of $500 is reasonable. This aligns with the range approved for senior, experienced trial litigators in this District. *Roadbuilders Mach. & Supply Co.*, 2024 WL 757154, at *5 n.27.

Christie Jess seeks an hourly rate of $600, with a reduced rate of $150 per hour for her work as a paralegal. Doc. 128-2 at 3–4. Although her requested rate of $150 per hour for services as a paralegal is appropriate, *M.B. v. Howard,* 555 F. Supp. 3d at 1073, $350 per hour is reasonable for her services as a lawyer. While Ms. Jess is as experienced as an employment attorney as Mr. Jess, her billing records reflect that her role in this case was primarily pretrial and supportive rather than strategic or trial-focused. In determining a reasonable rate, experience and skill—which she certainly has—are not the only factors, but courts must also consider the nature of services provided. *Blum*, 465 U.S. at 895 n.11. Ms. Jess's entries show extensive time spent on client communications, coordination with co-counsel, document review and management, scheduling, docket monitoring, and discovery administration, as well as review of pleadings and materials prepared by others. Doc. 128-2 at 4–17. While this work required legal training and

familiarity with the case, it did not reflect primary responsibility for litigation strategy, trial advocacy, or dispositive motion practice. *Id.* Even after excluding clerical and secretarial time, the remaining entries largely involve coordination-heavy and review-oriented tasks that require less complex legal judgment than lead-counsel functions, making her services substantive legal work but more analogous to services typically provided by experienced associates rather than lawyers commanding top-of-market partner rates. Given the nature of the work reflected in the billing records, a rate of $350 per hour more accurately reflects the prevailing market rate for comparable services. *See, e.g.,* *Marquez v. Midwest Div. MMC, LLC*, No. 19-2362, 2022 WL 17093036, at *6 (D. Kan. Nov. 21, 2022) (finding rate of $350 per hour reasonable for attorney with "extensive experience"); *Shigo v. Clark*, No. 21-2079, 2022 WL 16854271, at *3 (D. Kan. Nov. 10, 2022) (finding rate of $325 per hour reasonable for attorney).

Christopher Playter seeks an hourly rate of $550, but an hourly rate of $350 is reasonable. His requested rate exceeds what District of Kansas decisions have approved for similar services from attorneys with similar experience. Given his experience and the fact that he performed trial and litigation work alongside and under the direction of significantly more senior counsel, the services reflected in his billing records are comparable to work which courts in this District have compensated at a rate around $350 per hour. *See, e.g.,* *Marquez,* 2022 WL 17093036, at *6; *Shigo,* 2022 WL 16854271, at *3.

Applying rates that reflect those prevailing in the local market for similar services from lawyers of similar skill and experience, accordingly, results in the following reasonable rates: $500 for Mark Jess, $500 for Eric Playter, $350 for Christie Jess, $350 for Christopher Playter, and $150 for Christie Jess's paralegal time. This is consistent with the practice required by the lodestar method. *Blum*, 465 U.S. at 895 n.11; *Ramos*, 713 F.2d at 555.

### 3

With the total hours and reasonable rates now determined, the analysis can proceed to the lodestar calculation. The lodestar is determined by multiplying the hours reasonably expended by a reasonable hourly rate. *Hensley*, 461 U.S. at 433. After applying the 25 percent reduction to each individual's requested hours to account for duplicative staffing, inadequate billing records, and noncompensable time, 1,034.5 compensable hours remain from the 1,379.4 hours originally billed.

Multiplying those hours by the reasonable hourly rates identified above yields the following lodestar:

| Attorney | Hours Requested | Hours Awarded | Rate Awarded | Awarded Hours*Rate |
|---|---|---|---|---|
| M. Jess | 382.8 | 287.1 | $500 | $143,531.30 |
| E. Playter | 208 | 156 | $500 | $78,000.00 |
| C. Jess (Attorney) | 464.7 | 348.5 | $350 | $121,983.80 |
| C. Jess (Paralegal) | 58.4 | 43.8 | $150 | $6,570,00 |
| C. Playter | 265.5 | 199.1 | $350 | $69,693.80 |
| Lodestar Amount | | | | $419,778.80 |

These figures reflect the hours reasonably expended on the successful claims multiplied by rates consistent with those prevailing in this District. The resulting lodestar is $419,778.8. That amount represents the reasonable attorney fees recoverable before considering any further adjustments.

## C

The lodestar figure carries a presumption of reasonableness, but courts may adjust it upward or downward based on the circumstances. *Perdue*, 559 U.S. at 554. The City has argued that a downward departure is appropriate given the limited success of Stuart and Harden's attorneys. Doc. 139 at 14. The City is right: While most of the relevant adjustment considerations discussed below are neutral, the limited success obtained indicates a modification of the lodestar is necessary.

## 1

In evaluating whether any adjustments are necessary, courts should consider the twelve factors identified in *Johnson*, 488 F.2d at 717–19. *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1193. The Tenth Circuit has emphasized that many of these considerations overlap with the lodestar calculation process. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). Accordingly, a district court does not err by declining to discuss each *Johnson* factor explicitly so long as the lodestar

analysis considers those factors "most applicable to [a given] case." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1196 n.44; *see also Anchondo*, 616 F.3d at 1103–04.

The foregoing lodestar analysis accounts for nearly all of the *Johnson* factors. As discussed above, lodestar analysis reflects the time, labor, skill, and experience of the involved counsel. It also addressed the complexity involved in the litigation, billing history, and prevailing market trends. *Id.* Those findings encompass the substance of the *Johnson* inquiry and leave no basis for adjustment on those grounds. Neither the contingency-fee arrangement nor the nature of the attorney-client relationship warrants a modification, and nothing in the record suggests that the case was unusually undesirable.

One consideration, however, is not fully captured by the lodestar calculation: the results obtained. A fee award must reflect the degree of success obtained. *Hensley*, 461 U.S. at 436–37. Where a party prevails on only some claims, courts may reduce the fee to account for limited success, particularly when unsuccessful claims are distinct and do not share a common core of facts with the claims that succeeded. *Id.*; *Valdez v. Macdonald*, 66 F.4th 796, 842 (10th Cir. 2023).

Stuart and Harden's attorneys achieved only limited success. In particular because Stuart and Harden prevailed on a single Title VII failure-to-promote claim arising from a 2021 major promotion decision, while the remainder of their claims were dismissed at summary judgment. A reduction is therefore appropriate. *Hensley*, 461 U.S. at 434–35.

Stuart and Harden argue against such a reduction because "the dismissed claims involved the same set of facts and consistent legal theories." Doc. 128 at 5. But this argument fails as they provide no analysis or evidence supporting this assertion. Even charitably construing Stuart and Harden's argument, it may be the case that all the claims arose from a general shared theory of gender discrimination. *Id.* But the relevant inquiry is not whether the claims share a common theme. Rather it is whether the work on the unsuccessful claims was "expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435. Claims are unrelated when they depend on different facts and legal theories. *Fox*, 563 U.S. at 834.

The prevailing claims narrowly focused on a 2021 promotion decision and required proof specific to that event, including the scoring

process, candidate qualifications, and the decisionmakers' actions. *See* Doc. 81 at 21–28. By contrast, Cross's dismissed claims challenged different promotional contests in 2018 and 2022 and involved different positions and selection boards. *See id.* at 13–20. Work devoted to those separate events did not advance the successful 2021 claim and played no role in the trial presentation.

This is also true of the Section 1983 claims, which required proof of an official municipal policy or custom attributable to a final policy-maker. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Those claims were rejected because Stuart and Harden failed to identify any policy or policymaker and because their pattern-and-practice evidence did not create a triable issue. *See* Doc. 81 at 32–35. The legal and factual work undertaken to support municipal liability was unnecessary to establishing liability on the Title VII claim and could not have contributed to the verdict on the 2021 promotion decision. Thus, Stuart and Harden's argument fails. *Hensley*, 461 U.S. at 435.

Because work on the unsuccessful claims did not contribute to the verdict obtained, the next step would ordinarily entail excluding time devoted to those claims. That is impossible here. Given the tendency of Stuart and Harden's billing entries to combine multiple tasks and employ vague descriptions, most entries do not allow a reviewer to meaningfully distinguish between time spent on successful Title VII claims and time spent on unsuccessful Section 1983 theories or claims brought by Plaintiff Cross. Where no clear process exists to extract such hours, it is appropriate to apply percentage reduction for limited success. *See, e.g.*, *Iqbal v. Golf Course Superintendents Ass'n of Am.*, 900 F.2d 227, 228 (10th Cir. 1990) (affirming a percent reduction for limited success); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 990 (10th Cir. 1996) (affirming percent reduction to lodestar where monetary damages awarded fell far short of the amount sought).

As for the size of the percentage reduction, the City argues that because Stuart and Harden's attorneys prevailed on only two of the nine original claims, they should receive less than a quarter of the lode-star amount. Doc. 139 at 14. But there is "no precise rule or formula" requiring that the partial reduction need be directly proportional to success. *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1208 (10th Cir. 2015); *Flitton*, 614 F.3d at 1177. For example, a district court in New Mexico relying on Tenth Circuit authority reduced the lodestar amount by one third when only three of nine claims were successful. *Republican Party of New Mexico v. Torrez*, No. 1:11-900, 2024 WL 363188, at *11

(D.N.M. Jan. 31, 2024) (relying on *Iqbal*, 900 F.2d at 228). Given the proportion of successful claims, a reduction of 33 percent is warranted in this case. Stuart and Harden secured a verdict finding the City liable for gender discrimination for their non promotions under Title VII. Reducing the lodestar by one third adequately reflects that they were vindicated at trial on their Title VII claims but avoids compensating their attorneys for work undertaken on behalf of Cross and the Section 1983 claims that failed.

2

Having calculated the lodestar amount at $419,778.80, the one-third partial success reduction means the to-be awarded amount of attorney fees on the merits is $279,852.50. The following reflects how that applies by attorney:

| Attorney | Lodestar Amount | Partial Success Amount |
|---|---|---|
| M. Jess | $143,531.30 | $95,687.50 |
| E. Playter | $78,000.00 | $52,000.00 |
| C. Jess (Attorney) | $121,983.80 | $81,322.50 |
| C. Jess (Paralegal) | $6,570.00 | $4,380.00 |
| C. Playter | $69,693.80 | $46,462.50 |
| Total | $419,778.80 | $279,852.50 |

The figures shown reflect the lodestar amounts attributable to each timekeeper after applying reasonable hourly rates and the across-the-board reduction in compensable hours. They also incorporate the one-third reduction to account for partial success. Together, these amounts identify the portion of each attorney's and paralegal's work that is recoverable and form the total reasonable fee awarded on the merits.

III

For the foregoing reasons, Stuart and Harden's Motion for Attorney Fees, Doc. 128, GRANTED IN PART and DENIED IN PART.

IT IS ORDERED as follows:

Mark Jess is awarded $95,687.50 in attorney fees;

Eric Playter is awarded $52,000.00 in attorney fees;

Christie Jess is awarded $85,702.50 in attorney fees (including paralegal work);

Christopher Playter is awarded $46,462.50 in attorney fees.

It is so ordered.

Date: February 17, 2026              s/ Toby Crouse
                                     Toby Crouse
                                     United States District Judge